IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

NAPOLEÓN SEPÚLVEDA MORENO,
and LUZ MARIA MARTINEZ CASTRO,
and SANDRA LIZETTE CARDENAS
RAMIREZ, as Next Friend of S.S.C.,
minor child, Individually and for and
on behalf of All Those Who Are Entitled to
Recover Under the Texas Wrongful Death
and Survival Acts for the Death of
JESUS IVAN SEPÚLVEDA MARTINEZ,
and BRENDA BERENICE CASIAS CARRILLO,

       *Plaintiffs*,

v.                                       Civil Action No. 3:24-CV-00059-DB

LASALLE CORRECTIONS V LLC,

       *Defendant*.

## PLAINTIFF'S APPENDIX IN SUPPORT OF THEIR RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COME NOW Plaintiffs in the above-entitled and numbered cause, and file this Appendix to their response to Defendant's Motion for Summary Judgment.

## EXHIBITS

Plaintiffs attach the following in support of their Response to Defendant's Motion for Summary Judgment:

Exhibit A:    Deposition of Michael Sheppard

Exhibit B:    Deposition of Robert Eason

Exhibit C:    Deposition of Mark Sheppard

Exhibit D:    Deposition of Michael Dean Rose

Exhibit E:    Deposition of Sheriff Arvin West

Exhibit F:      Declaration of Andrew Virdell

Exhibit G:      Water District Meeting Minutes, September 27, 2022, PL1535-1536

Exhibit H:      Sealed Documents in Court Custody

Exhibit I:      Hudspeth Water Improvement District #1 Assorted Meeting Minutes, PL
                Bates 2172-73, 2205-06, 2251

Exhibit J:      Aff. of Juan Torrez, September 29, 2022, PL1618-1619

Respectfully submitted,

BENOIT LEGAL, PLLC
311 Montana Ave, Suite B
El Paso, Texas 79902
Ph: (915) 532-5544
Fax: (915) 532-5566

*/s/ Christopher Benoit*
CHRISTOPHER BENOIT
SBN 24068653
chris@coylefirm.com

***Attorney for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system. Parties or counsel of record will be served by electronic means.

*/s/ Christopher Benoit*
CHRISTOPHER BENOIT

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

NAPOLEÓN SEPÚLVEDA MORENO,
and LUZ MARIA MARTINEZ CASTRO,
and SANDRA LIZETTE CARDENAS
RAMIREZ, Individually and
Next Friend of S.S.C., minor
child, Individually and for
and on behalf of All Those Who
Are Entitled To Recover Under
The Texas Wrongful Death and
Survival Acts for the Death of
JESUS IVAN SEPÚLVEDA MARTINEZ,
and BRENDA BERENICE CASIAS
CARRILLO,

    Plaintiffs,

vs.                    Case No:  3:24-CV-00059-DB

LASALLE CORRECTIONS V LLC,

    Defendant.
_____/

VIDEO-TAPED DEPOSITION OF MICHAEL SHEPPARD
(Taken on behalf of the Plaintiffs)

DATE TAKEN:        October 21, 2024
TIME:            3:05 p.m. - 5:31 p.m. (EST)
PLACE:          Remotely Via Zoom

Examination of the witness taken before:

JULIE CULVER, Court Reporter
JEFF BABCOCK, Video Specialist

2

APPEARANCES OF COUNSEL:

On behalf of the Plaintiffs:

CHRISTOPHER BENOIT, ESQ.
Benoit Legal, PLLC
311 Montana Avenue, Suite B
El Paso, Texas 79902
Phone:  915-532-5544
E-mail:  chris@coylefirm.com

On behalf of Defendant:

SEBASTIAN NUNEZ, ESQ.
Kemp Smith LLP
P.O. Box 2800
El Paso, Texas 79999
Phone:  915-533-4424
E-mail:  sebastian.nunez@kempsmith.com

Also present:

LEAH SUMRALL
BRENT MAYR

22

it looks like that's -- that is your name signed March 10, 2016, is that correct?

A.    Yes, sir -- yes, sir.

Q.    Was this the time when you took over as warden for the West Texas Detention Facility for Emerald?

A.    There's two up there.  Yeah, this is -- yes, sir, I see Emerald on there, yes, sir.

Q.    And so you worked -- you worked as the chief of security from, I guess, what was it from June of 2015 until you took over as warden in March of 2016, is that right?

A.    Yes, sir.

Q.    Do you know why Mike Porter left?

A.    He lied to the marshals.

Q.    Oh, okay.  At that time when you took over in March of 2016, the facility was holding marshal's detainees, was it also holding detainees for immigration and custom's enforcement?

A.    Yes, sir.

Q.    And was it holding detainees for anybody else state or federal?

A.    No, sir.

Q.    Okay.  So it was just marshal and ICE detainees?

32

Q.   And you created the budget for that facility?

A.   No, sir, that was done out of the corporate office in coordination -- we had -- well, like this meeting here, we had Zoom meetings, but it was all done out the corporate office.  But I was involved in it, but I wasn't the final word.  Ruston had the final word, I think.

Q.   Okay.  You were in charge of staff selection for the facility and staffing?

A.   I signed off on the paperwork; yes, sir.

Q.   Well, I know it says here you -- you were responsible to make sure that all shifts were adequately staffed to meet the requirements of the procedures and post orders?

A.   Right, yes, sir.

Q.   Okay.  For the facility, that was ultimately your responsibility, right?

A.   Yes, sir.

Q.   And you -- this says that you implemented, basically, all new and revised policies effecting finance, food services, health services, maintenance, human resources, security programs, classification, case management, education, and recreation, is that true?

A.   It was in coordination with LaSalle, yes,

33

sir.

Q.   But for the West Texas Detention Facility, you were responsible for implementing those policies at that facility?

A.   Right; I was the one that signed off on them and reviewed them every year.

Q.   Okay.  Kind of the buck stopped with you at that facility, is that fair?

MR. NUNEZ:  Objection.

MR. BENOIT:  You can still answer, sir.

THE WITNESS:  I said, yes, sir.

MR. BENOIT:  Okay.  All right.

BY MR. BENOIT:

Q.   And I also note that it talks about kind of overseeing all maintenance of buildings and permanent improvements of the facility here at the bottom, do you recall doing that as well?

A.   Yes, sir.

Q.   And in that position, you were -- it sounds like it was quite a bit of issues with water at the facility during your time there, is that right?

MR. NUNEZ:  Objection to form.

THE WITNESS:  The whole town.

MR. BENOIT:  Sorry?

THE WITNESS:  The whole town.

34

BY MR. BENOIT:

Q.   The whole town, but you're -- and your position is being responsible for supplies at that facility -- the facility also had problems with water, correct?

MR. NUNEZ:  Form.

THE WITNESS:  Yes.

BY MR. BENOIT:

Q.   Did that -- in your role as a warden, did you have to coordinate with local government officers in order to figure out what to do about provision of water to the facility during your time as warden?

MR. NUNEZ:  Form.

THE WITNESS:  Yes, sir.

BY MR. BENOIT:

Q.   And which governmental entities did you work with to figure that out?

A.   I worked hand in hand with the sheriff on it. I didn't get along good with the water department because I had to lay about 60 people off because of them at one time.

Q.   Why was that?

A.   Because ICE pulled all of their inmates out because there was no water.

Q.   Okay.

35

A.    Staffing levels was low for what my population was, so I had to lay a bunch of people off.

Q.    And when you say you didn't get along well with the -- the water utility, you are referring to the Hudspeth County Water Improvement and Control District No. 1?

A.    Yes, sir, they wouldn't communicate with anybody.

Q.    Okay.  Was that the sole source of water when you started working for LaSalle there -- for the facility?

A.    Yes, sir.

Q.    How was that water bought to the West Texas Detention Facility?

A.    40-mile waterline running from Van Horn to the city and the city to the facility.

Q.    To Sierra Blanca and then from Sierra Blanca to the facility?

A.    Yes, sir.

Q.    Okay.  Did -- I think I read somewhere that the facility, at least at one point, had about 1,053 beds, is that the number that you recall?

A.    Yes, sir, something -- pretty right -- that's about right.

Q.    And about 450 of them were ICE beds, and the

46

MR. NUNEZ:  Objection, form.

THE WITNESS:  Yes, sir.

BY MR. BENOIT:

Q.   You mentioned earlier that you had to deal with the -- the water being cut off at the facility. I think that was sometime in 2019, is that your memory?

A.   The whole town was out of water.

Q.   And was the detention facility the biggest user of water in the town?

MR. NUNEZ:  Form.

THE WITNESS:  Yes, sir.

BY MR. BENOIT:

Q.   How did you know that?

A.   I (INDISCERNIBLE) water bill.  I paid every month (INDISCERNIBLE) $1,000 (INDISCERNIBLE).

Q.   Mr. Sheppard, we can't hear you.  You went out on us there.

MR. MAYR:  We can see and hear you, Mike.

THE WITNESS:  It's saying everything is on.

MR. MAYR:  Yeah, you just cut out a little bit on us.

MR. BENOIT:  Yeah, if you will, just repeat your answer -- that will by great.

THE WITNESS:  What was the question?

47

MR. BENOIT:  How did you know that the detention facility was the largest water user in the town?

MR. NUNEZ:  Form.

THE WITNESS:  Because the population in the town was like 300 -- 3 or 400, and I had close to a 1,000.  And I had outrageous water bills every month.

BY MR. BENOIT:

Q.    Okay.  And those water bills were from the -- the Water Control and Improvement District No. 1?

A.    Right.

Q.    And at that time, do you know the cause of why the water was shut down in 2019?

A.    I am not sure.  Probably, a problem with the pump -- the wells in Van Horn where they got the water from.

Q.    And as warden, what was your response to that crisis?

A.    I don't understand the question.

Q.    Well, what did you do since the water was shut off to the facility?  It was -- well, was there any water coming into the facility at that time?

A.    No, sir, because I know the whole town ran out.  We didn't have it at the house.  Nobody had

48

water.

Q.   Okay.  So what did you do as the warden to secure water for the people staying in the facility at that time?

A.   Wasn't nothing that I can do at that time.

Q.   Did you try to work with the county to get the water back online?

A.   I talked with the sheriff about it every day.

Q.   Did you try to speak with the -- anybody else in county government, other than the sheriff?

A.   The judge -- we met with the judge, didn't get any cooperation there.  But I mean, we never got cooperation from the water district.

Q.   Did you -- as a warden, did you try to -- to approach the water district to figure out how to resolve the problem?

MR. NUNEZ:  Form.

THE WITNESS:  Well, I -- I've asked them -- you know, I asked them, "Hey, what is the problem?  Is it Van Horn?  Is it us -- our end?"

You know, stuff like that.

BY MR. BENOIT:

Q.   Did you -- my understanding is that you and Sheriff West worked together to try to fix and figure out where the leaks were in the piping from Van Horn

49

to Sierra Blanca, is that correct?

A.    Yes, sir; I rode it on a -- on a side-by-side ATV from Sierra Blanca to the tank in Van Horn in 25 degree temperature in the snow looking for a leak.

Q.    Okay.  And were you with Sheriff West when you did that?

A.    No, sir, I wasn't -- no, sir.  He had deputies assigned all over town going down every street everywhere that there were water lines.  We had people scattered everywhere looking.

Q.    And you were doing that to try to make sure that you could shore up the water supply for the West Texas Detention Facility?

MR. NUNEZ:  Objection to form.

(MULTIPLE SPEAKERS.)

THE WITNESS:  The town didn't have water. The prison didn't have water.

BY MR. BENOIT:

Q.    Okay.  Did you tell anybody at LaSalle that that was what you were doing?

MR. NUNEZ:  Form.

THE WITNESS:  Yeah, Mr. Eason knew it.  I talked to him about it.  I kept him up to date every time it went out.

BY MR. BENOIT:

50

Q.    Did you keep him up to date with your communications with the water district?

MR. NUNEZ:  Form.

THE WITNESS:  I am sure that I did.  I am going to say that I believe I did.  Yeah, I probably did, but I am not a hundred percent sure.

BY MR. BENOIT:

Q.    At one point I think that it was reported that you had to install porta potties and -- and bring in water for the people in the detention facilities, is that right?

A.    We put the porta potties in, yes, sir.  And we ordered -- shoot, I don't know how many pallets of bottled water.  We kept about 13 pallets of bottled water on hand at all times, that's how frequently they had issues.

Q.    And at one point, did -- and I think you mentioned earlier that ICE actually pulled detainees out of the facility for a period of time?

A.    Yes, sir.

Q.    Do you know how many weeks or months that was that ICE detainees weren't allowed to be up there?

A.    It was well over a year.

Q.    And into 2020?

(MULTIPLE SPEAKERS.)

51

THE WITNESS:  Sir?  Pardon me.

MR. BENOIT:  Sorry.  No, it's all right.  You got muffled there.  Can you repeat the answer?

THE WITNESS:  It was well over a year.  It was long enough that LaSalle put a -- drilled a well (INDISCERNIBLE) put a water purification system in -- contracted with a company to come operate it (INDISCERNIBLE) maintenance guys to do it.  It was a year -- probably close to 18 months to do it.

BY MR. BENOIT:

Q.    Okay.  So you --

THE COURT REPORTER:  I am so sorry.  I am going to have to stop.  Sir, I am so sorry.  Can you repeat your answer?  There are some spots there that I can't be a hundred percent sure on.

THE WITNESS:  It was -- it was over a year.  It might have been as much as 18 months.

BY MR. BENOIT:

Q.    And just -- and I will try to make sure that we cover some of the things that you said.  So what I heard -- and I -- was that you also said that it was long enough that LaSalle ended up drilling a well for the facility?

A.    They drilled -- they drilled a well.  And

52

they put in a 1,200 gallon water storage tank.  They put in a water purification system, reverse osmosis system, hired a company to -- that installed it to operate it and train one of the maintenance guys how to do it on site if there was ever any issues when their people weren't there.

Q.  Wow!  So --

A.  It took a long time.

Q.  So y'all went from relying on the water coming in from the water district from Van Horn to actually trying to shore up your own supply of water at the facility separate from the water district?

A.  Well, to supplement the water district and to take some pressure off of their -- off them because the well -- we couldn't produce enough a day with the -- with the water purification system to completely take care of the facility.

Q.  Okay.

A.  So we supplemented -- we supplemented the well and the RO system in the tank to cutback on our usage of city water, which would help the town and ensure that we did have water.

Q.  And that -- that's a -- so that's a pretty big shift that you had to oversee during those last couple of years of your employment, is that fair?

53

A.    Yes, sir.

Q.    And the -- do you know how deep those wells were that the facility ended up building?

A.    Between 12 and 1,400 feet.

Q.    Okay.  And that was done by LaSalle?

A.    LaSalle paid for it, yes, sir.

Q.    And you -- did you oversee that as part of your duties as a warden in making sure that that took place?

A.    Every day.  I actually stayed out there with the well drillers.  I had never seen a well drilled, especially that deep.  It was kind of interesting.

Q.    Yeah, that's got to be quite a rig.  And when did -- how soon -- I know that you left Hudspeth in the fall of 2022, how soon before that did the ICE detainees come back to the West Texas Detention Facility?

A.    We might have had -- we never had the population that we did at the time of the water outage.  We would just have some here and there.  The marshals kept our beds full.  We started getting some back probably a year, year and a half before I left.

Q.    Okay.  So --

(MULTIPLE SPEAKERS.)

THE WITNESS:  It wasn't the 4 and 500.  It

54

was five or six here, seven or eight there.

BY MR. BENOIT:

Q.   Did the water -- the water problems -- during the period of time that you were dealing with that, did the overall census decline in that same period of time?

A.   Did the what now?  Excuse me?

Q.   Did the overall census decline during that period of time?

A.   Oh, yes, sir.

Q.   And did it ever --

(MULTIPLE SPEAKERS.)

THE WITNESS:  With marshals' inmates, not the ICE like we had, no, sir.

BY MR. BENOIT:

Q.   Okay.  But in terms of overall beds, did it recover with marshals' inmates?

A.   Right; after the -- after the -- the well, and tank, and all were installed.  We put the monitoring system at the halfway point at Gifford-Hill in between Van Horn.  LaSalle bought a -- probably a $30,000 monitoring system.  They sent out alerts, everything -- to get the water flow stopped if it lessened.  I could look at the tank level at Gifford-Hill instead of driving 25 miles to go over

55

there and look at the tank level.  I could -- I could pull it up on my phone or computer.  That was $20 or $30,000 that LaSalle spent right there to give the county --

Q.  Okay.  And that --

(MULTIPLE SPEAKERS.)

THE WITNESS:  -- to give the county a heads up, so --

BY MR. BENOIT:

Q.  And I think your brother said that at one point he would drive out to the detention facility after y'all had a tank to get water for the -- the county jail, do you recall that ever happening?

A.  Honestly, I don't know.

Q.  Did you -- did you ever -- so you oversaw -- it sounds like you had, right down to the monitoring equipment as a warden, you were overseeing the -- the water volume in the facility after you -- y'all installed that system?

A.  Right.

Q.  Did you -- did you ever recall providing permission to give water back to the county as you were monitoring those water levels?

A.  No, we never had -- we didn't have a way to send it back to anybody.  It was just --

57

thought of it.  He was the one that found the tankers. He found the driver's, you know.  I just made sure that the security staff know, hey, we're going to have trucks dumping water all night, you know.  Have somebody posted out there to help them.

Q.   Okay.  So you mentioned -- you mentioned earlier that you -- that you tried to work with the county judge in solving the water crisis, is that right?

A.   Yes, Mr. Eason, Mr. McConnell, Mr. Cooper; they all came over and we met with them.

Q.   Who is Mr. McConnell?

A.   He owns LaSalle.

Q.   Okay.  And Mr. Cooper?

A.   Is -- he is Jay Eason, Robert Eason's boss. I don't know what his title is.

Q.   So they -- they all came at one point to interact with county government to try to figure out how to solve the problem?

A.   Yes, sir.

Q.   Did -- at one point, did LaSalle have solar panels that it was operating?

A.   Only solar panels that we had were at the water monitoring system at Gifford-Hill.

Q.   Okay.  And did you -- did you provide

101

MR. BENOIT: Misrepresents testimony.

BY MR. NUNEZ:

Q. Okay. Why don't you go ahead and tell me what you told Mr. Benoit?

A. I rode a UTV from Sierra Blanca to Allamoore to Gifford-Hill along the main waterline looking for any -- any breaks or any leaks that would be the reason that the town wasn't getting water.

Q. So in short, you would assist in trying to find the source of where the loss of water was coming from, correct?

A. Yes, sir.

MR. BENOIT: Form.

BY MR. NUNEZ:

Q. Okay. You also indicated to Mr. Benoit that you would coordinate with other, you know, city officials, is that correct?

A. Yes, sir --

Q. But you also --

A. -- the sheriff.

Q. -- indicated that this wasn't an issue that was only faced by LaSalle, it was an issue faced by the entire city of Sierra Blanca, true?

A. True.

Q. So there were hundreds of homes without

114

but other than that I'm good.

Q.   Can I rely on your testimony as accurate in response to my questions?

A.   If you ask me the same questions again you will get the same answers.

(MULTIPLE SPEAKERS.)

MR. NUNEZ:  Mr.  Sheppard, thank you so much for your time, okay.

THE WITNESS:  Thank you.

REDIRECT EXAMINATION

BY MR. BENOIT:

Q.   Mr. Sheppard, when you went to the water control district meetings prior to September 27th, you said that you did so to gather information to forward that to Mr. Eason, is that right?

MR. NUNEZ:  Form.

THE WITNESS:  Right.

MR. BENOIT:  That's all.  That's the only question that I have.

RECROSS EXAMINATION

BY MR. NUNEZ:

Q.   And Mr. Sheppard, one last question.  When you went to that water district meeting to gather information for Mr. Eason, you indicated that that was for your -- that you made the decision to go and not

115

because somebody told you to, correct?

MR. BENOIT:  Form.

THE WITNESS:  They never told me to -- they never told me to.  I just -- I went because I wanted them to know what was going on.

BY MR. NUNEZ:

Q.   Okay.  And Mr. Eason never told you, hey, go to this water district meeting?

A.   No, sir.

MR. NUNEZ:  Thank you.  I pass the witness.

FURTHER DIRECT EXAMINATION

BY MR. BENOIT:

Q.   And -- and -- and when you sent that information on to Mr. Eason, did he ever tell you to stop going to the water district meetings and to give you that information?

MR. NUNEZ:  Objection, form.

THE WITNESS:  No, sir.

MR. BENOIT:  Pass the witness.

MR. NUNEZ:  I have no questions.

MR. BENOIT:  All right.  That will conclude the deposition.  While we're still on the record, Mr. Sheppard, and you still have battery, Brent, I assume we're sending to you to read and sign?

MR. MAYR:  Yeah.

117

CERTIFICATE OF OATH

STATE OF FLORIDA)

COUNTY OF LEON)

I, the undersigned authority, certify that MICHAEL SHEPPARD, appeared before me via Zoom and was remotely duly sworn to the best of my ability on the 21st day of October, 2024.

Signed this 21st day of October, 2024

_____
JULIE CULVER, Court Reporter
Notary Public - State of Florida
My Commission No. GG 7908
Expires:  July 4, 2028

CERTIFICATE OF REPORTER

118

STATE OF FLORIDA)

COUNTY OF LEON)

I, JULIE CULVER, certify that I was authorized to and did stenographically report the Zoom deposition of MICHAEL SHEPPARD.  A review of the transcript **WAS REQUESTED,** and the transcript is a true and complete record of my stenographic notes to the best of my ability within the limits and quality of the audio for the remote proceedings.

I further certify that I am not a relative, employee, attorney, or council of any of the parties, nor am I a relative or employee of any of the parties' attorney or council connected with the action, nor am I financially interested in the action.

DATED this 21st day of October, 2024.

_____.
JULIE CULVER, Court Reporter

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| NAPOLEON SEPULVEDA MORENO, and LUZ MARIA MARTINEZ CASTRO, and SANDRA LIZETTE CARDENAS RAMIREZ, Individually and Next Friend of S.S.C., a minor child Individually and for and on behalf of All Those Who Are Entitled to Recover Under The Texas Wrongful Death and Survival Acts for the Death of JESUS IVAN SEPULVEDA MARTINEZ, and BRENDA BERENICE CASIAS CARRILLO,<br>        Plaintiffs, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| V. | ) No. 3:24-CV-00059-DB |
| LASALLE CORRECTIONS V, LLC,<br>        Defendants. | )<br>)<br>) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

ROBERT J. EASON,

Corporate Representative

JANUARY 28, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of ROBERT J. EASON, Corporate Representative, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on January 28, 2025, from 8:56 a.m. to 12:06 p.m., at the offices of ACR Ink, LLC, 221 N. Kansas, Suite 505, El Paso, Texas, pursuant to the Federal Rules of Civil Procedure.  Reported by: Rhonda McCay, CSR, CCR, RPR, CLR.

Robert J. Eason - January 28, 2025

2

A P P E A R A N C E S


    FOR THE PLAINTIFF:
        Mr. Christopher Benoit
        BENOIT LEGAL, PLLC
        Attorneys at Law
        The Law Center
        311 Montana Avenue, Suite B
        El Paso, Texas 79902
        Ph. 915.532.5544
        chris@coylefirm.com


    FOR THE DEFENDANT:
        Mr. Sebastian Nunez
        KEMP SMITH, LLP
        Attorneys at Law
        221 N. Kansas, Suite 1700
        El Paso, Texas 79901
        Ph. 915.533.4424
        sebastian.nunez@kempsmith.com


                      I N D E X

WITNESS                                      PAGE

ROBERT J. EASON
    Examination By Mr. Benoit                4
    Examination By Mr. Nunez                 135

Certificate of the Court Reporter           136

Corrections and Signature                   137

Case 3:24-cv-00059-DB   Document 80-1   Filed 04/11/25   Page 30 of 105

Robert J. Eason, Corp. Rep. - January 28, 2025   28

Q.   This is Exhibit 2, the most recent supplemental responses to our request for production.

(Exhibit 02 marked)

Q.   We won't look at this right now, but I just want to put that out there.

A.   All right.

Q.   And Exhibit 3 is going to be LaSalle Bates 24 to 37.

(Exhibit 03 marked)

Q.   I'm going to ask you to look at Exhibit 3.  And then, if you want to thumb through it just to make sure you understand what's in that document, and then I just have a few questions about that.

A.   Okay.  All right, sir.

Q.   My understanding is this is a good portion of Mr. Sheppard's personnel file.  Is that your understanding?

A.   I don't know what all was in Mike's personnel file.  But from looking at these documents, it appears that it would be something that would be kept in his file.  It's a lot of old Emerald records.

Q.   Right.  And so -- it looked like a lot of the initial materials you had in terms of background checks and his application and things like that were from his time with Emerald; is that correct?

Case 3:24-cv-00059-DB    Document 80-1    Filed 04/11/25    Page 31 of 105

Robert J. Eason, Corp. Rep. - January 28, 2025    29

A.    That's what these documents appear to be, yes, sir.

Q.    When he -- LaSalle took over the contract at West Texas Detention Facility I think in April of 2017; is that right?

A.    Yes, sir.

Q.    Okay.  At that time, Mr. Sheppard was the warden for the facility?

A.    Yes, sir.

Q.    What was the transfer for -- what did that look like for him in terms of -- in terms of him -- his duties changing in any way as warden from Emerald to LaSalle?

A.    When we got the notification that we were going to be taking over the contract from Emerald, of course, myself -- I don't remember.  We'd go out there and transition the facility.

When I say "transition the facility," I went out there, I sat down with Mike, I talked to Mike. We talked a little bit about his background in corrections, how long he worked for Emerald.

I remember talking to, you know, my boss about the transition and, you know, Mike was the warden there, was doing a good job there.  And we decided to keep him on as the warden.

Case 3:24-cv-00059-DB   Document 80-1   Filed 04/11/25   Page 32 of 105

Robert J. Eason, Corp. Rep. - January 28, 2025   30

Q.   Were there any -- was there anybody that you did not keep on who was working for Emerald?

A.   Yes.  There was -- at the time, if I remember correctly, when we transitioned the facility in '17, the inmate population was very low.  I don't remember exactly how many inmates that we had at the facility, but there were a lot of staff there.

So, after we took -- after we transitioned the facility, we actually had to lay off some employees.  So, as part of that reduction in force, there was some correctional staff, there was some ranking supervisors, and I do remember an assistant warden that we had to let go.  I cannot remember his name.

Q.   Okay.  Did -- at the time that you took over the facility, who were the detainees?  Where were they coming from?

A.   We had some ICE detainees out there -- I can't remember how many -- and we had some marshals.

Q.   Any county?

A.   No.

Q.   Hudspeth County has always had their own jail, right?

A.   Yes, sir.  I can't speak for when Emerald operated the facility.  But when we took over, there were no county inmates housed at West Texas Detention

Case 3:24-cv-00059-DB   Document 80-1   Filed 04/11/25   Page 33 of 105

Robert J. Eason, Corp. Rep. - January 28, 2025    31

Facility.

Q.   And to be clear, the intergovernmental service agreements that existed between ICE or the marshals, those were with the county, not with your company, correct?

A.   Correct.  Agreement between the -- if I remember correctly, the original agreement is between the marshals service and Hudspeth County.

Q.   All right.  And then, ICE had a supplement agreement attached to that marshals agreement?

A.   I believe so.  For lack of a better word, I call it ICE would piggyback off of the marshals agreement with the county.

Q.   Right.

A.   Yes, sir.

Q.   And then, the county would have an operating agreement with -- first, I guess it was with Emerald and then with LaSalle?

A.   Yes, sir.

Q.   And then, that would -- ultimately, LaSalle was responsible for complying with the county's agreement with whatever federal agency they were contracted with, right?

A.   Yes, sir.

Q.   Okay.  I want to take a look at page number 25

It might be a detention facility.  So, depending on what type of inmates that we are housing there -- and, again, it depends on the policy -- they may have some input on just general operations, you know, how the policy is laid out and implemented, things like that.

Q.   Okay.

A.   Let's see.  I believe that's about it.

Q.   Okay.  I'll hand you what we will mark as Exhibit 4.

A.   Okay.

(Exhibit 04 marked)

Q.   This has been provided to us.  My understanding is this is the job description that -- I'm sorry.  For purposes of the record, this is 173 to 174.

MR. NUNEZ:  What exhibit is this one, Chris?

MR. BENOIT:  Exhibit 4.

MR. NUNEZ:  The one you just reviewed was 3?

MR. BENOIT:  Yes.

Q.   (BY MR. BENOIT)  My understanding, in terms of what was produced to us, is this was the job description for Mike Sheppard's position that was provided by LaSalle.  Is that what it appears to be to you?

A.   It appears to be, sir.  Yes, sir.

Case 3:24-cv-00059-DB    Document 80-1    Filed 04/11/25    Page 35 of 105

Robert J. Eason, Corp. Rep. - January 28, 2025    45

county and the marshals service, and then we have an operations agreement.

Q.   And the operations agreement is with the corporation -- with the West Texas Detention Facility --

A.   The operations agreement is basically between us and Hudspeth County --

Q.   And the county?

A.   -- because the county owns the actual physical plant of the facility.

Q.   Right.  And so, just so we have this clear: The county -- so you don't know exactly how the county has arranged its ownership of the facility?

A.   No.

Q.   Okay.

A.   No, sir.

Q.   Your understanding is that -- and we don't have the operations agreement.  We tried to get it.  I guess we will try to get it from y'all because the county apparently doesn't have it?

A.   Okay.

Q.   But my understanding is that is with -- do you know if that's with the corporation -- the West Texas Detention Facility Corporation -- or if it's directly with Hudspeth County?

A.   I don't know.

Case 3:24-cv-00059-DB   Document 80-1   Filed 04/11/25   Page 36 of 105

Robert J. Eason, Corp. Rep. - January 28, 2025   46

Q.   Okay.   But that is something that LaSalle has, correct?

A.   An operations agreement?

Q.   An operations agreement, yeah.

A.   Yes, sir.

Q.   Okay.   How often is that operations agreement amended?

A.   I don't know.   I have nothing to do with amending agreements, contracts, or anything like that.

Q.   Okay.   Who does?

A.   That would be done out of the corporate office with the CFO.

Q.   When did -- when did that facility stop detainees -- or including detainees from ICE?

A.   I'm trying to remember.

Honestly, I can't remember.   It was either 2019.   I don't remember when -- I remember we stopped housing ICE detainees, but I don't remember the exact day.

Q.   Okay.   As part of the agreement that -- the IGA that Hudspeth County has with the marshals, my understanding is that the county is responsible for ACA accreditation; is that right?

MR. NUNEZ:   Form.

A.   I don't know about any ACA accreditation.   I

Robert J. Eason, Corp. Rep. - January 28, 2025    60

biggest employer in Hudspeth County?

A.   Yes.

Q.   And is it your understanding that it's the biggest water user in Hudspeth County?

MR. NUNEZ:   Form.

A.   No.   I don't have any knowledge on other water use in Hudspeth County.

If I'll -- can I back up?

Q.   (BY MR. BENOIT)   Sure.

A.   Can I say something?

Okay.   When you said "Hudspeth County" -- is LaSalle the biggest employer?   Let me say that it's the biggest employer in Sierra Blanca.   As far as the entire county, I wouldn't have that information.

Q.   Okay.   How about the question about it being the biggest water user in Sierra Blanca?

MR. NUNEZ:   Form.

A.   I would say, yes, it is.

Q.   (BY MR. BENOIT)   The LaSalle -- my understanding is that the property that Mr. Sheppard was living in when he lived there was LaSalle property; is that correct?   The home.

A.   Yes.

Q.   Okay.   Did LaSalle purchase that property -- well, did Emerald -- did LaSalle purchase that property

Q.   When was the first time you recall that affecting the operations at the West Texas Detention Facility?

A.   The first time that we had water affect operations?

Q.   Yeah.

A.   I would say, I don't know an exact date. Probably end of '18, first part of '19.

Q.   Okay.  And my understanding is that it did cause water to stop flowing to the facility several times.  Is that right?

A.   Yes.  We've had issues where we did not receive water from Sierra Blanca.

Q.   What was the longest period of time that the facility was without water?

A.   As far as when we've operated the facility, we have never been totally without water.  We can't -- we can't let the unit not have any water.  So that didn't happen.

Q.   There was no point you had to bring water in because it wasn't coming through the pipes?

A.   Yes.  We've had to go to different sources to bring water into the facility.  But as far as the inmates not having water, not having quality of life, not being able to flush their toilet, get a drink of

Case 3:24-cv-00059-DB   Document 80-1   Filed 04/11/25   Page 39 of 105

Robert J. Eason, Corp. Rep. - January 28, 2025   100

investigated by law enforcement.

I said, What are you talking about? because I had just talked to him the day before.

She said, I don't know; I'm just telling you there is a rumor going around that he is being investigated.

I said, Well, okay; Let me know if you hear anything else.

That's the last time I talked to Gina about it.

Q.   You talked to Warden Sheppard on the 27th?

A.   Yes.

Q.   And what did you talk to him about at that time?

A.   I just asked him -- he had been off the week prior.  He wanted to go home to see his family in Florida.  I called him just to check on him, How are things going? How was your time off? Did you enjoy yourself? You know, how are things on the unit? Anything happen while you were gone?  Just those general conversations.

Q.   Do you remember what time of day that call was?

A.   No, sir, I don't.

Q.   After you learned of the arrest, did you communicate with Sheriff West about what was going on?

Robert J. Eason, Corp. Rep. - January 28, 2025   101

A.   No.

Q.   What were the actions that the company took after learning that he had been arrested?

A.   We separated him.

Q.   Did the company conduct any investigation?

A.   No.

Q.   Did the company communicate with federal or state officials to see what had happened?

A.   Our government liaison did.

Q.   That was Mr. Prince?

A.   Yes, sir.

Q.   And what was the purpose of communicating with the officials?

A.   Just I guess -- I don't know.  I wasn't part of those conversations.  But to find out the status of the arrest because we had to make a decision as a company about, you know, Mike's future with the company.

Again, we look at every arrest on a case-by-case basis.  When I was informed of the seriousness of the allegations and what he was being accused of, it was in the best interest of the company and we separated him, I believe it was that next morning.

Q.   I guess the 29th is what is written here; is that right?

ACR Ink, LLC

ph. 915.542.3422                                 schedule@acr-ink.com

Case 3:24-cv-00059-DB    Document 80-1    Filed 04/11/25    Page 41 of 105

Robert J. Eason, Corp. Rep. - January 28, 2025    102

A.   I'd have to go back and look at a calendar. But the investigation -- he got arrested I believe it was on that Wednesday, and so the 29th was --

Q.   Thursday.

A.   -- Thursday, yes.

Q.   Did -- did anybody communicate -- so what documentation did you have in front of you when you made the decision to separate his employment?

A.   I didn't have any information in front of me.

Q.   What information did you have?

A.   I just had information from our government liaison that -- what he was being accused of, what he was arrested for, and that he was booked into El Paso County Jail.

Q.   But the company didn't have any documentation other than what he had been told?

A.   I did not, no.

Q.   Well, I'm asking about the company.  You are here to testify to this very specific topic.  Did the company have --

A.   No.

Q.   -- any documentation?  No?

A.   No.

Q.   Did the company communicate with Sheriff West about what was going to happen at the detention facility

Robert J. Eason, Corp. Rep. - January 28, 2025   118

tell him it was part of his job duties because it's not.

Q.   (BY MR. BENOIT)   Did you -- so you never talked with Sheriff West about the circumstances of what happened on the 27th?   September 27th.

A.   No, I did not.

Q.   Did anybody at the company?

A.   Not to my knowledge.   If they did, I'm unaware of it.

Q.   Again, the company did not conduct any investigation of the circumstances of that day?

A.   No.   No, sir.   I mean, we don't have the jurisdiction to conduct an investigation like that. That was being handled by the FBI or the Texas Rangers.

That's typically -- you know, our policies, if something happens that's off the facility, that's totally away from work, if -- you know, if one of our employees is accused of doing something that's not part of their job, part of work, we are going to refer that to law enforcement for investigation because we don't have the jurisdiction and authority to do that.

Q.   But the company never investigated whether he was doing something on behalf of the company, right?

MR. NUNEZ:   Form.

A.   No.

Q.   (BY MR. BENOIT)   That's correct?   That

Robert J. Eason - January 28, 2025

136

C E R T I F I C A T E

STATE OF TEXAS        )

COUNTY OF EL PASO    )


        I, Rhonda McCay, Certified Shorthand Reporter in and for the State of Texas, State of New Mexico and Registered Professional Reporter, hereby certify that this transcript is a true record of the said proceedings, and that said transcription is done to the best of my ability.

        GIVEN UNDER MY HAND AND SEAL OF OFFICE on this 7th day of February, 2025.


_____
Rhonda McCay, CSR, CCR, RPR
Texas Certification Number 4457
Date Of Expiration:  1/31/2027
ACR Ink, LLC
Firm Registration Number CRF-11613
221 N. Kansas, Suite 505
El Paso, Texas 79901
Ph.: 915.542.3422

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION


NAPOLEÓN SEPÚLVEDA MORENO,
and LUZ MARIA MARTINEZ CASTRO,
and SANDRA LIZETTE CARDENAS
RAMIREZ, Individually and
Next Friend of S.S.C., minor
child, Individually and for
and on behalf of All Those Who
Are Entitled To Recover Under
The Texas Wrongful Death and
Survival Acts for the Death of
JESUS IVAN SEPÚLVEDA MARTINEZ,
and BRENDA BERENICE CASIAS
CARRILLO,

     Plaintiffs,

vs.                              Case No:  3:24-CV-00059-DB

LASALLE CORRECTIONS V LLC,

     Defendant.
_____/




         VIDEO-TAPED DEPOSITION OF MARK SHEPPARD
            (Taken on behalf of the Plaintiffs)

DATE TAKEN:          October 21, 2024
TIME:                12:09 p.m. - 1:55 p.m.( EST)
PLACE:               Remotely Via Zoom


         Examination of the witness taken before:

               JULIE CULVER, Court Reporter
              JEFF BABCOCK, Video Specialist

2

APPEARANCES OF COUNSEL:

On behalf of the Plaintiffs:

CHRISTOPHER BENOIT, ESQ.
Benoit Legal, PLLC
311 Montana Avenue, Suite B
El Paso, Texas 79902
Phone:  915-532-5544
E-mail:  chris@coylefirm.com

On behalf of Defendant:

SEBASTIAN NUNEZ, ESQ.
Kemp Smith LLP
P.O. Box 2800
El Paso, Texas 79999
Phone:  915-533-4424
E-mail:  sebastian.nunez@kempsmith.com

Also present:

LEAH SUMRALL
RICHARD ESPER

38

Hudspeth County on that day?

MR. ESPER:  I am going to instruct him not to answer -- to invoke his fifth amendment privilege and not answer that question.

THE WITNESS:  (NO RESPONSE.)

MR. BENOIT:  Mr. Sheppard, are you going to go ahead and take the advice of counsel?

THE WITNESS:  Yes.

BY MR. BENOIT:

Q.  Did you come back from work around 5:15 on that day?

MR. ESPER:  Same answer.

BY MR. BENOIT:

Q.  Did your brother pick you up from your house at 717 North Wilson to take you to the Hudspeth County Water and Control Improvement District No. 1 meeting?

MR. ESPER:  Chris, same -- same -- same advice based on his fifth amendment privilege.

MR. BENOIT:  Okay.  I will just kind of run through these, Richard, and we will -- understanding that that's the answer.

MR. ESPER:  Okay.

BY MR. BENOIT:

Q.  Okay.  On your way to the Water and Control Improvement District, did you drive the Fivemile Tank

39

on Farm-to-Market Road 1111?

MR. ESPER:  Same answer.

MR. BENOIT:  And to be clear, Richard, you're -- you're invoking the privilege on -- on Mr. Sheppard's behalf, right?

MR. ESPER:  That's correct.

MR. BENOIT:  Okay.

BY MR. BENOIT:

Q.   Okay.  Is this -- is this -- is this Fivemile Tank on Farm-to-Market 1111?

MR. ESPER:  Same response, Chris.

MR. BENOIT:  All right.

BY MR. BENOIT:

Q.   Are you familiar with Fivemile Tank on Farm-to-Market 1111?

MR. ESPER:  Same answer, Chris.

BY MR. BENOIT:

Q.   Did you and your brother upon driving to Fivemile Tank, did you park your car here where the red dot is located?

MR. ESPER:  Same advice and answer, Your Honor -- I mean, Chris.  I'm sorry.

MR. BENOIT:  No problem.

BY MR. BENOIT:

Q.   Did you see people crouching in the mesquite

40

where the red dot is located on the video?

MR. ESPER:  Same advice and response, Chris.

BY MR. BENOIT:

Q.  Did you believe those people to be immigrants when you saw them, if you saw them?

MR. ESPER:  Same advise and answer.

BY MR. BENOIT:

Q.  Was it light out so that -- such that you could see what was in the mesquite across the water?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.  Did your brother, Mike Sheppard, get out of the car with a shotgun and place it on the hood of his truck.

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.  Did he aim that shotgun at the persons hiding in the brush?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.  Did you or your brother look at what was in the brush with binoculars to confirm what you were looking at?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

41

Q.    Did you hear your brother yell -- well, did your brother fire one shot at the brush that we just talked about?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.    Did you hear your brother yell, "Salguen de su puta madere (*)," after firing the first shot?

(*ENGLISH TRANSLATION IS, COME OUT YOU, BITCHES.  QUOTATION IN SPANISH AND ENGLISH TRANSLATION PROVIDED BY MR. BENOIT.)

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.    Did your brother take the second shot at the people in the brush?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.    Did you or your brother go to look at what you had shot after taking the shot?

MR. ESPER:  Same advice and answer.

MR. BENOIT:  We're going to switch images here.  That is going to be Exhibit No. 3, what we just looked at.

(WHEREUPON, EXHIBIT NO. 3 WAS MARKED FOR IDENTIFICATION.)

MR. ESPER:  And Chris, for the record, that

43

Q.   Did you get back in your vehicle within a minute of the second shot?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.   Did you drive from that water hole directly to the Hudspeth County Water and Control Improvement District No. 1 meeting with your brother?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.   Did you meet up with Sheriff Arvin West at that meeting when you arrived?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.   Did you leave that meeting between 7:45 and 8:00 p.m.

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.   Did you come home after that meeting?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.   On the following day, on January 28th, did you go to work at the -- the Hudspeth County Sheriff's Office?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

46

Q.   Did you tell Ranger Torres that you were on your way to the Hudspeth Water Board meeting when you stopped at Fivemile Tank?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.   Did you tell Ranger Torres that after your brother shot that neither you nor your brother checked to see what you had shot?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.   Did you tell Ranger Torres that instead you just continued your trip to Hudspeth Water Improvement Board Meeting?

MR. ESPER:  Same advice and answer.

BY MR. BENOIT:

Q.   Mr. Sheppard, when did you leave Hudspeth County?

A.   (NO RESPONSE.)

Q.   Mr. Sheppard?

MR. ESPER:  Yeah, he's going to -- same advice and answer on that for the time being, Chris.

BY MR. BENOIT:

Q.   Okay.  When did you --

(MULTIPLE SPEAKERS.)

83

CERTIFICATE OF OATH

STATE OF FLORIDA)

COUNTY OF LEON)

I, the undersigned authority, certify that MARK SHEPPARD, appeared before me via Zoom and was remotely duly sworn to the best of my ability on the 21st day of October, 2024.

Signed this 21st day of October, 2024

_____
JULIE CULVER, Court Reporter
Notary Public - State of Florida
My Commission No. GG 7908
Expires:  July 4, 2028

84

CERTIFICATE OF REPORTER

STATE OF FLORIDA)

COUNTY OF LEON)

I, JULIE CULVER, certify that I was authorized to and did stenographically report the Zoom deposition of MARK SHEPPARD.  A review of the transcript **WAS REQUESTED**, and the transcript is a true and complete record of my stenographic notes to the best of my ability within the limits and quality of the audio for the remote proceedings.

I further certify that I am not a relative, employee, attorney, or council of any of the parties, nor am I a relative or employee of any of the parties' attorney or council connected with the action, nor am I financially interested in the action.

DATED this 21st day of October, 2024.

_____.
JULIE CULVER, Court Reporter

# EXHIBIT D

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

```
NAPOLEON SEPULVEDA MORENO          )
and LUZ MARIA MARTINEZ CASTRO,     )
and SANDRA LIZETTE CARDENAS        )
RAMIREZ, Individually and Next     )
Friend of S.S.C., a minor child    )
Individually and for and on        )
behalf of All Those Who Are        )
Entitled to Recover Under The      )
Texas Wrongful Death and Survival)
Acts for the Death of JESUS IVAN   )
SEPULVEDA MARTINEZ and BRENDA      )
BERENICE CASIAS CARRILLO,          )
     Plaintiffs,                   )
                                   )
V.                                 ) No. 3:24 CV-00059-DB
                                   )
LASALLE CORRECTIONS V, LLC,        )
     Defendants.                   )
```

*******************************************************

ORAL DEPOSITION OF

MICHAEL DEAN ROSE

OCTOBER 22, 2024

*******************************************************

ORAL DEPOSITION of MICHAEL DEAN ROSE,

produced as a witness at the instance of the Plaintiffs,

and duly sworn, was taken in the above-styled and

numbered cause on October 22, 2024, from 10:55 a.m. to

1:07 p.m., at the offices of ACR Ink, LLC, 221 N.

Kansas, Suite 505, El Paso, Texas, pursuant to the

Federal Rules of Civil Procedure.  Reported by:  Rhonda

McCay, CSR, CCR, RPR.

2

A P P E A R A N C E S


        FOR THE PLAINTIFF:
            MR. CHRISTOPHER BENOIT
            BENOIT LEGAL, PLLC
            Attorney at Law
            311 Montana Avenue, Suite B
            El Paso, Texas 79902
            Ph. 915.532.5544
            chris@coylefirm.com


        FOR THE DEFENDANT:
            Mr. Sebastian Nunez
            KEMP SMITH, LLP
            Attorneys at Law
            221 N. Kansas, Suite 1700
            El Paso, Texas 79901
            Ph. 915.533.4424
            sebastian.nunez@kempsmith.com



                     I N D E X

WITNESS                                          PAGE

MICHAEL DEAN ROSE
    Examination By Mr. Benoit                    3
    Examination By Mr. Nunez                     76
    Further Examination By Mr. Benoit            111


Certificate of the Court Reporter               116



                   E X H I B I T S

NO.          DESCRIPTION                         PAGE

Exhibit 05   Subpoena                            8

you mentioned Sierra Blanca, the area marked the Corporation, the LaSalle facility.  Anywhere else in the county that the District provides water to?

A.   No.  Just those.

Q.   Okay.

A.   I think, when they originally put the line in, they let a couple of ranchers get a meter alongside the line coming to Sierra Blanca.  I can't remember all of those, but it used to be more than what it is.

But as they're cutting -- as they're cutting -- they're no longer needing our services, we go ahead and we're just not going to do that anymore.

Q.   Okay.

A.   It's been a pain.

Q.   When you've had cattle, did you -- did you use the District's water?

A.   No.  I was 40, 42 miles away.

Q.   Okay.  We heard yesterday that the detention facility has about over a thousand beds.  Is that your understanding?

A.   I think a thousand beds.  Then, they have what is that little back part where they have in case.  Every once in a while, there are emergencies, and they take extra --

Q.   Take extra --

Michael Dean Rose - October 22, 2024        18

A.    -- people in, so...

Q.    Is it fair to say that the detention facility is the largest user of water in the District?

A.    Oh, yeah.

MR. NUNEZ:  Objection, form.

Q.    (BY MR. BENOIT)  How do you know that?

MR. NUNEZ:  Objection, form.

THE WITNESS:  Huh?

Q.    (BY MR. BENOIT)  Sorry.  So Mr. Nunez is going to potentially object occasionally.  You can still answer after the objection.  It's just for the record.

A.    Yes, it's the largest.

Q.    How do you know that?

A.    I'm on the board.  I see the water bills.

Q.    Do you have an idea of what -- the percentage of the total revenue that you-all bring in, how much of that comes from LaSalle?

MR. NUNEZ:  Form.

THE WITNESS:  Pardon?

MR. NUNEZ:  I'm sorry.  I'm going to -- it's just lawyer talk.  If I do object, just ignore me.

THE WITNESS:  Okay.

Q.    (BY MR. BENOIT)  It's just for the record.

A.    What was the question?

to go dig a well.

He might have been coming to us and saying, Are you-all willing to pay for the well drilling to see if there was any water there?

Q.   (BY MR. BENOIT)   Do you have any independent memory about what you talked about with the warden and Sheriff West that day?

A.   It had to be -- the only well possibilities would have to be out there at the Corporation.

Q.   Okay.

A.   So I'm assuming that's what it was.

Q.   I know you-all were talking in and around that same time about well issues out in Allamoore, right?

A.   That was part of our agenda.

Q.   Do you remember what you talked to them about that day?

A.   With the warden?

Q.   Yes.

MR. NUNEZ:   Form.

A.   I really don't.  I don't even remember him being part of the conversation unless he came in at the end and started putting in his 2 cents or something.

Q.   (BY MR. BENOIT)   Had he come to -- you mentioned he had come to some meetings beforehand.  Is that right?

Michael Dean Rose - October 22, 2024          69

A.   Yeah.   He would show up every once in a while, whenever he was wanting to ask something.

Q.   Okay.  But you don't remember what he talked about with you at this meeting?

MR. NUNEZ:   Form.

A.   No.  You know, I'm just curious:  He must have come in right before we closed the meeting because she closed -- we closed it at 7:37.  So the discussion was between us and Arvin.  He just showed up out of the blue.  It was right at the end of the meeting.

Q.   (BY MR. BENOIT)   Okay.

A.   And maybe he threw a few 2 cents in about what Arvin had previously been talking about, maybe.

We were talking about the washout where we get waterlines maxed.  That's what he was talking about, where we had some pipe wash out with the rainfall.

Q.   Was that discussion about the washout separate from the discussion with Arvin West and the LaSalle warden?

A.   Yes, sir.

MR. NUNEZ:   Form.

A.   Arvin, if you notice, he wasn't even on the agenda.  He just showed up.  He just showed up, and we either had a little information -- discussion with Sheriff Arvin West about well possibilities, probably

about -- and I'm assuming the stuff he came up with was the stuff about -- he was trying to get us to go with water underneath the Corporation -- the old Corporation and assuming that there was enough water there for us.

It used to support a golf course -- an 18-hole golf course -- the old Corporation did, but that well had caved in, so we were trying to get water somewhere else out on the Corporation.

Q.   (BY MR. BENOIT)   How long did you-all stay at the meeting after the meeting closed?

A.   It could have been there for another 20 minutes.  These guys get to gabbing and it is hard to get out of there sometimes.

Q.   When you say "these guys," who are you referring to?

A.   It can be board members sitting and visiting about everything -- football or it can be politics.  It gets terrible when it's politics.

Q.   Do you remember speaking with the warden after this meeting?

MR. NUNEZ:  Form.

A.   Huh-uh.

Q.   (BY MR. BENOIT)   No?

A.   No, sir.

Q.   When did you first hear about the shooting that

had occurred?

A.    The next day.

Q.    How did you --

A.    That was on a Tuesday.  And I was getting out of Bible study, probably around 7:30, 7:00.  And I believe Arvin called me, and he says, Do you know what -- do you know what happened yesterday?

I said, Yeah, I heard.  What the heck?  What's going on?

And he said, They're saying that possibly ole Sheppard killed somebody out at Five Mile.

I said, What?

He said, Yeah, they're thinking it's him.

And I remember us having the conversations and saying, If he did something that heinous, he sure did hide it well because he didn't look like he was nervous or nothing.

Q.    That's what you said?

A.    Yeah, both of us.

He says, I don't know.  And he says, I'm going to turn this straight over to Texas Rangers.  I'm too close to the situation.

And I said, Let me know if anything comes of it.

And shit, it get so busy, I didn't even --

end, it said that him and Arvin -- but from my recollection, I don't think that -- I don't know. Because he showed up right at the end, and Arvin was talking to us about some possibilities of new wells. And out of the blue, they just walked in.

Q.   So there is obviously a difference between speaking at a meeting or asking questions at a meeting. Would you agree with me?

A.   Yeah.  Most of the people that come in to a meeting and want to speak, we let them talk in an open forum.

Q.   So my question is:  Has anybody from LaSalle ever spoken under an open forum?

A.   Yeah.  They have even been on the agenda several times when they come to talk.

Q.   Do you recall what they talked about?

A.   Mainly, water, water deals -- about that.

Q.   Do you recall specifics?

A.   No.

Q.   Do you recall specific instances?

A.   No.

Q.   All right.  Do you recall if this was, you know, for example, before 2022 or after 2022?

A.   Before, a lot.  After, it was just the new warden to introduce himself, and then, one other time,

116

C E R T I F I C A T E

STATE OF TEXAS        )

COUNTY OF EL PASO   )

I, Rhonda McCay, Certified Shorthand Reporter in and for the State of Texas, State of New Mexico and Registered Professional Reporter, hereby certify that this transcript is a true record of the said proceedings, and that said transcription is done to the best of my ability.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this 8th day of November, 2024.

_____
Rhonda McCay, CSR, CCR, RPR
Texas Certification Number 4457
Date Of Expiration:  1/31/2025
ACR Ink, LLC
Firm Registration Number CRF-11613
221 N. Kansas, Suite 505
El Paso, Texas 79901
Ph.: 915.542.3422

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

NAPOLEON SEPULVEDA MORENO        )
and LUZ MARIA MARTINEZ CASTRO,   )
and SANDRA LIZETTE CARDENAS      )
RAMIREZ, Individually and Next   )
Friend of S.S.C., a minor child  )
Individually and for and on      )
behalf of All Those Who Are      )
Entitled to Recover Under The    )
Texas Wrongful Death and Survival )
Acts for the Death of JESUS IVAN )
SEPULVEDA MARTINEZ and BRENDA    )
BERENICE CASIAS CARRILLO,        )
     Plaintiffs,                 )
                                 )
V.                               ) No. 3:24-CV-00059-DB
                                 )
LASALLE CORRECTIONS V, LLC,      )
     Defendant.                  )
     ******************************************************

ORAL DEPOSITION OF

ARVIN WEST

JANUARY 31, 2025

     ******************************************************

          ORAL DEPOSITION of ARVIN WEST, produced

as a witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered cause

on January 31, 2025, from 1:37 p.m. to 3:45 p.m., at the

law offices of Stephen Spurgin located at 310 North

Mesa, Suite 300, El Paso, Texas, pursuant to the Federal

Rules of Civil Procedure.

                                   Reported by:

                   Rhonda McCay, CSR, CCR, RPR, CLR

2

A P P E A R A N C E S


        FOR THE PLAINTIFFS:
            Mr. Christopher Benoit
            BENOIT LEGAL, PLLC
            Attorneys at Law
            The Law Center
            311 Montana Avenue, Suite B
            El Paso, Texas 79902
            Ph. 915.532.5544
            chris@coylefirm.com


        FOR THE DEFENDANT:
            Mr. Reed Loftis (Via Zoom)
            BRACKETT & ELLIS, PC
            Attorneys at Law
            100 Main Street
            Fort Worth, Texas 76102
            Ph. 817.338.1700
            mramos@belaw.com
            rloftis@belaw.com


        FOR HUDSPETH COUNTY:
            Mr. Stephen W. Spurgin
            Attorney at Law
            310 N. Mesa, Suite 300
            El Paso, Texas 79901
            Ph. 915.779.2800
            stephen@spurginlaw.com


                    I N D E X

WITNESS                                          PAGE

ARVIN WEST
    Examination By Mr. Benoit                    4
    Examination By Mr. Loftis                    105
    Further Examination By Mr. Benoit            114


Certificate of the Court Reporter               115

Corrections and Signature                       116

something -- and pennies or nickels or whatever the hell he does.

Q.   All right.  So that's kind of the "no."  What about the "yes" part of your answer, that he is responsible for improvements?

A.   From what I saw.

Q.   Yeah.  Just all your observations.

A.   Yeah.  If there was issues there, it was his job to take care of those issues, yes.

Q.   Including the water issue?

A.   Yes.

Q.   Let's take a look real quick at Exhibit 3.

(Exhibit 03 marked)

MR. BENOIT:  Reed, can you hear me all right?

MR. LOFTIS:  I can hear you just fine. Thank you.

MR. BENOIT:  All right.

Q.   (BY MR. BENOIT)  This is LaSalle 173 and 174 and 25.  So there is two different documents.

MR. SPURGIN:  This is Exhibit 3?

MR. BENOIT:  Yes.  Exhibit 3.

Q.   (BY MR. BENOIT)  So, Sheriff, there's two different documents here.  One is a job description for a warden from LaSalle, and the other is on page 25, the

improvement district coming from the City of Van Horn was shut off; is that right?  Or water was not coming up to Sierra Blanca.

A.   All right.  I'll agree with that.  I don't know -- if it was shut off.  I think they had pump issues and water break issues and main issues and stuff like that.

Q.   Okay.  It was reported -- I think Mike Sheppard said and it was reported in a news article that you and he had traveled along the pipeline on an ATV to check for leaks around that period of time.  Do you remember that?

A.   I don't remember -- we didn't go in an ATV.  I drove it in a pickup.  He wasn't with me.  I think he did it on an ATV.

Q.   Okay.  All right.  Was he doing that in his capacity as the warden, as far as you understood?

A.   I think he was trying to help out the water district to find out where the water was going because we couldn't -- Van Horn was saying they were pumping 217,000 gallons -- or 217 gallons a minute.  Sierra Blanca was saying they weren't getting that amount.  And the only probable solution is then you have a problem in between the two places.

So he drove it one day on however he did it

and I drove it in a pickup one day.

Q.   And a big part of that reason he was driving it was because it was affecting the facility?

A.   The facility, yes.

Q.   Okay.  Did you talk to him about that when he did it?

A.   I could have.  I don't remember.

Q.   Were y'all out there at night or was it during the day?

A.   I went during the day.  No, we didn't go together.

Q.   Okay.  All right.  So he was on his own?

A.   Yeah.

Q.   Was that the beginning of Watergate?

A.   No.

Q.   Why don't you describe for us what you know as Watergate.

A.   I want to say, 2017, we had that hard freeze. Y'all had it up here too.  All the lines in town froze and stuff like that.

I wish I could remember his name -- the warden at the time -- ended up -- there was porta potty issues and not letting some of the inmates go out to the porta potties, or they didn't have porta- --

Usually, what happens, because if you grew

Q.   You don't remember?

A.   No.

Q.   It refers to him as being the warden of LaSalle?

A.   Right.

Q.   Did he go there talking about the fact he couldn't take a bath?

A.   No.  Like I said, it was the fact that the water was -- we were limited to -- either limited or not any water at all.

Q.   Okay.  And that was affecting the facility?

A.   It was affecting everybody.

Q.   Right.

When Mike Sheppard went to these meetings, was he there talking about how it was affecting the facility?

MR. LOFTIS:  Objection, form.

A.   Sometimes he did, yeah.

Q.   (BY MR. BENOIT)  Do you remember this meeting in particular?

A.   I recall the meeting, but I don't recall what all the topic of discussion or the discussion about that.  But we had several different discussions like that.

Q.   Okay.  At the time, you were also trying to get

A.    A little over a hundred.

Q.    Today?

A.    [No audible response].

Q.    What about then?

A.    Probably a little less then.

Q.    Are they -- are they on federal land or your own land?

A.    We're in Texas.  We don't have federal land.

Q.    That's right.  I spend too much time in New Mexico.

A.    Apparently.

No.  It's leased land.

Q.    Leased land.

A.    But not State.  It's privately owned land.

Q.    Is it close to Sierra Blanca?

A.    Both of them are.  I have four different places leased.

Q.    Which direction from Sierra Blanca?

A.    North and south.

Q.    Okay.  On that day, were you tending to cattle at all?

A.    No, I don't think so.  I don't remember.

Q.    Okay.  All right.  So did you see Mike Sheppard that day?

A.    I know I saw him that afternoon.  I may have

seen him during the day in passing or something.

Q.   Where did you see him in the afternoon?

A.   At the water office.

Q.   Okay.  Why did you end up -- you were going to explain.  Why did you end up at the water office?

A.   Well, we had been discussing about drilling the well at the -- at the corporation site.

Q.   The Sierra Blanca Corporation?

A.   Yes.  The Sierra Blanca Corporation site.

And I had something in regards to -- maybe it was a price of the quote that Alan had got me of around 60,000 -- 50- or 60,000 to do the test well out there.

Q.   Okay.

A.   I was on my way home, and I saw they were having a meeting.  So I just pulled in there real quick to give them the update that, Hey, I think we can get the test well done for around 50,000 or 60,000 dollars.

Q.   Okay.

A.   Now, the next hurdle was finding the 50-, 60,000.

Q.   Were they -- when you arrived, had the meeting started?

A.   Oh, yeah.  It was well under way.

Q.   Okay.  That wasn't an item necessarily that you

Q.  And did Mike -- well, how soon -- so it adjourned at 7:37.  How soon before the meeting adjourned did you show up?

A.  I got there probably 5:30-ish.

Q.  Okay.

A.  I had left the office and everybody else had left the office.  I was kind of -- me and the chief deputy were the last ones there.  It would have been 5:15, 5:20 when I left the office.  Somewhere between 5:15 and 5:30.

Q.  Do you recall when Mike showed up?

A.  I was there for a pretty good while.  It was probably 6:00, maybe 6:30, when he got there.

Q.  And did he -- was he talking about the well issue as well?

A.  Basically, he was echoing what I had been saying.

Q.  And what was that?

A.  That the well out there -- the test well needed $60,000 to drill it.

Q.  Okay.

A.  And then, he went on to a deal about, If you guys need anything, let me know, whatever.

Q.  On behalf of LaSalle?

A.  Uh-huh.

Q.   Yes?

A.   On behalf of LaSalle or behalf of him.

Q.   Well, he wasn't going to offer $60,000.

A.   No, no, no.  And obviously, they weren't going to offer it either, because they haven't.

Q.   Right.  But he was there to talk about the well, and part of financing potentially was still coming from LaSalle?  Or, that was what you guys were trying to make happen?

A.   I guess so.  I mean, I don't remember the gist of his conversation.  He just showed up.

Q.   Okay.  And he was echoing what you were saying?

A.   Yeah.

Q.   What time did you leave after -- after the meeting?  Did you stay till the end of the meeting?

A.   You've got to understand in meetings like that, in small towns, you've got to go in there and you have to have your visiting session, and then you have your meeting, and then you have to have your second visiting session.

Q.   Okay.

A.   So it was probably 7:00 -- 7:00-ish when we went outside.

Q.   Okay.  And you said "we went outside."  Did you go out with Mike?

115

                    C E R T I F I C A T E


STATE OF TEXAS        )

COUNTY OF EL PASO    )




        I, Rhonda McCay, Certified Shorthand Reporter in

and for the State of Texas, State of New Mexico and

Registered Professional Reporter, hereby certify that

this transcript is a true record of the said

proceedings, and that said transcription is done to the

best of my ability.

        GIVEN UNDER MY HAND AND SEAL OF OFFICE on this

14th day of February, 2025.




                    _____
                    Rhonda McCay, CSR, CCR, RPR
                    Texas Certification Number 4457
                    Date Of Expiration:  1/31/2027
                    ACR Ink, LLC
                    Firm Registration Number CRF-11613
                    221 N. Kansas, Suite 505
                    El Paso, Texas 79901
                    Ph.: 915.542.3422

# EXHIBIT F

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

NAPOLEON SEPULVEDA MORENO          )
and LUZ MARIA MARTINEZ CASTRO,     )
and SANDRA LIZETTE CARDENAS        )
RAMIREZ, Individually and Next     )
Friend of S.S.C., a minor child    )
Individually and for and on        )
behalf of All Those Who Are        )
Entitled to Recover Under The      )
Texas Wrongful Death and Survival  )
Acts for the Death of JESUS IVAN   )
SEPULVEDA MARTINEZ and BRENDA      )
BERENICE CASIAS CARRILLO,          )
    Plaintiffs,                    )
                                   )
V.                                 ) No. 3:24-CV-00059-DB
                                   )
LASALLE CORRECTIONS V, LLC,        )
    Defendants.                    )
  ******************************************************

ORAL DEPOSITION OF

ANDREW VIRDELL

JANUARY 7, 2025

******************************************************

ORAL DEPOSITION of ANDREW VIRDELL,

produced as a witness at the instance of the Plaintiffs,

and duly sworn, was taken in the above-styled and

numbered cause on January 7, 2025, from 9:47 a.m. to

11:38 a.m., at the offices of ACR Ink, LLC, 221 N.

Kansas, Suite 505, El Paso, Texas, pursuant to the

Federal Rules of Civil Procedure.

Reported by:

Rhonda McCay, CSR, CCR, RPR, CLR

Andrew Virdell – January 7, 2025

2

A P P E A R A N C E S


FOR THE PLAINTIFF:
Mr. Christopher Benoit
BENOIT LEGAL, PLLC
Attorneys at Law
The Law Center
311 Montana Avenue, Suite B
El Paso, Texas 79902
Ph. 915.532.5544
chris@coylefirm.com


FOR THE DEFENDANT:
Mr. Manuel Ramos
BRACKETT & ELLIS, PC
Attorneys at Law
100 Main Street
Fort Worth, Texas 76102
Ph. 817.338.1700
mramos@belaw.com


I N D E X

WITNESS                                                    PAGE

ANDREW VIRDELL
    Examination By Mr. Benoit                              4
    Examination By Mr. Ramos                               80
    Further Examination By Mr. Benoit                      86


Certificate of the Court Reporter                          88

Corrections and Signature                                  89

A.   Just normal stuff.  I'm never hardly there during the -- I go early in the morning and check in with my guys.  My business is in Van Horn, so I'm in Van Horn all day until 5:00 or 6:00 in the afternoon.

Q.   Okay.  I'll hand you what we'll mark as Exhibit 2.

(Exhibit 02 marked)

Q.   I want to ask you to look at page -- there is page numbers at the bottom of this document.  You can see on the first page, it's Plaintiffs' 1634.  Do you see that?

A.   1634, yes.

Q.   I'm going to ask you to turn the page to 1635.

A.   Okay.

Q.   Actually, 1637 -- 1636.

This is an article that LaSalle's attorneys produced from CNN.  Do you recognize the article?

A.   No.

Q.   Okay.  Do you recall speaking with a journalist after the shooting happened?

A.   No.

Q.   Do you see where it says "Hudspeth County Commissioner Andrew Virdell" there at the bottom?

A.   Yes.

Q.   It says that you stated that you were having

coffee with the brothers and the sheriff just an hour -- a few hours before the shooting.  Is that true?

A.   I don't know when the shooting occurred.

Q.   Okay.  Did you have coffee with them that day?

A.   It was that day?

Q.   And where were you?

A.   I don't recall having coffee with them.

Q.   Do you recall meeting with them?

A.   No, sir.  No, I don't.

Q.   Did you --

A.   It may have been the next day.  I remember meeting and talking about it either the next day or so, but I don't -- I don't remember that day that he was there.  I think he was at the water -- at the water meeting -- the sheriff was -- is what --

Q.   Okay.

A.   -- they told -- this is what I understood, that he was at the water meeting.

Q.   Okay.  This says that you were at the sheriff's office together, but the brothers did not mention any plans to go hunting that evening.

       MR. RAMOS:  Objection, form.

A.   No.

Q.   (BY MR. BENOIT)  Is that not true?

A.   I don't remember if we were together.  I go to

the sheriff's office a lot.  I don't remember if it was that day or whatever.

Q.   Were you -- did you say this to a reporter, that you were --

A.   I remember saying it to a reporter.

MR. RAMOS:  Objection, form.

Q.   (BY MR. BENOIT)  And this is an article from -- let's see -- October 7th, 2022, if you go to the first page of that exhibit.

A.   The date I don't remember.

Q.   I'm asking you to go to the first page of that exhibit and you can see the date there.

A.   October 7th, yeah.

Q.   You spoke to a journalist.  That's what you told a journalist sometime in that period of time --

MR. RAMOS:  Objection, form.

Q.   (BY MR. BENOIT)  -- between September 27th and October 7th, 2022?

A.   I remember them asking me about the gentlemen, about both of them.

Q.   Okay.  And --

A.   To my knowledge, I just couldn't -- it was kind of a shock to everybody, so -- that they would do that -- that anybody would do that in Sierra Blanca.

Q.   But this is what you told a journalist, what is

What was the date?  October?

Q.  Well, the date was September 27th of the shooting.

A.  I don't know why I would be -- there's nothing going on in September.  The only time that I had met with the sheriff was on our July 4th celebration, and he was talking to LaSalle to get funding for the -- for the fiesta -- the July 4th celebration.

Q.  But you do recall speaking to a journalist, right?

A.  Yeah, I believe so.

Q.  And you would have told the journalist the truth at the time that you spoke to them?

A.  Yes, sir.  I would have -- if that's what I said right there, I mean, I feel the same way right now.

Q.  Okay.  About what you said to the journalist here?

MR. RAMOS:  Objection, form.

A.  Yeah.

Q.  (BY MR. BENOIT)  Did you talk -- I'm sorry.  Did you say the only reason you would meet with the sheriff at the sheriff's office was for the July 4th celebration?

A.  During that time, that's the only time that we -- he had a committee.  We were putting on the July

Q.   -- responsive?

A.   Yes.

Q.   Nobody ever told you not to produce a document?

A.   No.

        MR. RAMOS:  That's all I have.

                FURTHER EXAMINATION

BY MR. BENOIT:

Q.   Just a couple of quick follow-up questions.

        I just want to make sure I understand what you told me in our testimony regarding that article that we were looking at.  You do recall talking to a reporter, correct?

A.   Yes, I think so.

Q.   And you recall talking -- expressing that you were in shock when you talked to that reporter?

A.   Yes.  I remember saying that to somebody too. I don't know if it was the reporter.

Q.   You don't recall everything else that you said in that interview?

A.   No.

Q.   Okay.  But you would have been telling the truth to the reporter when you were asked questions?

A.   Yes, I would have.

Q.   And is it fair to say that your memory was better back in October of 2022 than today as we sit

here?

   A.   Yes.

          MR. BENOIT:  That's all the questions I have.

          Just on the record, you have an opportunity, as a witness who is not represented by either party, to do what is called "read and sign" today's deposition.  You can do that, in which case the court reporter will send you the deposition.  You can look through it and make sure that everything was written down correctly, and then you can certify that and send it back.

          THE WITNESS:  Sure.

          MR. BENOIT:  You also can waive that right. It's totally up to you.

          THE WITNESS:  Yes, that's fine.

          MR. BENOIT:  Which would you like?

          THE WITNESS:  Just send it to me.

          MR. BENOIT:  Okay.  The address, just for the record.  I know you said it at the beginning.

          THE WITNESS:  Email or...

          THE REPORTER:  Yes, just give me your email.

          THE WITNESS:  highcountry1 windstream.net.

          (Deposition concluded at 11:38 a.m.)

88

C E R T I F I C A T E

STATE OF TEXAS        )

COUNTY OF EL PASO   )

I, Rhonda McCay, Certified Shorthand Reporter in and for the State of Texas, State of New Mexico and Registered Professional Reporter, hereby certify that this transcript is a true record of the said proceedings, and that said transcription is done to the best of my ability.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this 16th day of January, 2025.

_____
Rhonda McCay, CSR, CCR, RPR
Texas Certification Number 4457
Date Of Expiration:  1/31/2025
ACR Ink, LLC
Firm Registration Number CRF-11613
221 N. Kansas, Suite 505
El Paso, Texas 79901
Ph.: 915.542.3422



EXHIBIT
E

PLAINTIFFS 001634

CNN  US



Audiol ive TV

# A former prison warden and his brother face additional charges in the shooting of migrants in West Texas

By Ashley Killough, Rosa Flores and Ed Lavandera, CNN
Published 11:03 PM EDT, Fri October 7, 2022





Gaby Velasquez/El Paso Times/USA Today Network

A spent shotgun shell sits near a water tank where a group of migrants were attacked on Sept. 27. It's unclear if the casing is linked to the fatal shooting of one of the migrants.

**(CNN)** — Two brothers who were accused of <u>shooting two migrants</u> in West Texas are now facing additional charges of aggravated assault with a deadly weapon after being rearrested earlier this week.

Michael and Mark Sheppard, both 60, remain in custody as of Friday afternoon and bond has been set at $250,000 each, according to Chief Deputy Lazaro Salgado with the Hudspeth County Sheriff's Office.

CNN previously reported both men had posted bond, also of $250,000 each, on Monday on separate manslaughter charges and were released, according to Hudspeth County Sheriff Arvin West. They were rearrested on Wednesday by the Texas Rangers on the additional charges.

Both men have close ties to law enforcement, according to multiple sources. Michael Sheppard was the warden at a privately-run prison in the area, and Mark Sheppard was employed by the sheriff's office to do maintenance work. Both were terminated from their positions after the shooting, according to LaSalle Corrections and the sheriff's office.

The men are accused of shooting at a group of migrants who had stopped to get a drink of water, killing one and wounding another. The alleged shooting took place on September 27 near Sierra Blanca, Texas.

Surviving migrants told investigators they hid in the brush when the men pulled over in their truck, according to probable cause affidavits for the first arrest. The migrants said they heard the men shout something in Spanish to the effect of, "Come out you sons of bitches, little asses," before one of them fired two rounds.

Mark Sheppard told investigators the two brothers thought they were shooting at javelinas, a type of wild pig, but did not check to see whether they'd hit anything.

Immigrant rights advocates said this area of West Texas has become an increasingly busy route for migrants, and to reach the area, migrants had likely been walking for days in harsh conditions.



PLAINTIFFS 001635




El Paso County Sheriff's Office

Mark Sheppard (left) and Mike Sheppard

## Additional charges filed

On Thursday, the sheriff's office released documents showing the additional charges of aggravated assault with a deadly weapon, a second-degree felony. The new arrest affidavits are almost exactly the same as the originals, except for a tweak in the language when the investigator describes the shooting.

The affidavits for the first arrest on manslaughter say, "Mark Sheppard told us Michael Sheppard exited the truck with a shotgun, leaned on the hood of the vehicle and fired two rounds."

The new affidavits with the additional aggravated assault charges say Michael Sheppard exited the truck with a shotgun, leaned on the hood of the vehicle "and recklessly fired two rounds into their location."

CNN has been unable to reach or speak with the Sheppards' attorneys.

When reached by CNN, a representative with the Far West Texas Regional Public Defender's office declined to comment on the case.

Hudspeth County Commissioner Andrew Virdell said he was having coffee with the brothers and the sheriff just a few hours before the shooting. They were at the sheriff's office together, but the brothers did not mention any plans to go hunting that evening, Virdell said.

"I can't even believe they did it. It's just a shock," Verdell said. "I don't know what their motive would be."



**RELATED ARTICLE**
A Texas prison warden and his brother face charges in a shooting that killed a migrant and injured another

PLAINTIFFS 001636

PLAINTIFFS 001637

Mark Sheppard initially told investigators they were hunting for ducks, then changed it to birds, then changed it to javelinas, according to the initial arrest affidavit.

Virdell confirmed javelinas are often found in the area of the shooting, but he said it's hard to believe migrants could be mistaken for javelinas.

"If you get people ducking in bushes, I guess they could look like that (javelinas)," he said, but added, "Usually when you fire a gun in Texas, you go see what you hit or whatever. You don't just drive off."

The victims who were injured and killed by the two brothers last week were Mexican nationals, according to a news release issued by the Mexican Consulate in El Paso. The victims were not identified by name.

The victims and their families are receiving consular and legal services for a possible human rights violations case and the Anti-Defamation League has been notified, the news release states. CNN has confirmed with the league the case was reported to them.

"ADL is deeply disturbed to learn of the apparent shooting of two migrants, one fatally, in Hudspeth County, TX. While the investigation is underway, we strongly call for law enforcement to examine the potential of these shootings being hate-motivated," the league's Southwest office tweeted. "Migrants deserve to be treated with dignity and respect as they come to the U.S. to seek a better and safer life. Hate-filled rhetoric demonizing immigrant has real-world, deadly consequences and must stop."

The Mexican national who was injured remains hospitalized and is "out of danger," the Mexican Consulate of El Paso news release states. Arrangements are being made for the body of the deceased individual to be repatriated to Mexico.

## Michael Sheppard's time as warden

Michael Sheppard, the former warden of the West Texas Detention Facility in Sierra Blanca, was a subject of a scathing report which documented alleged racism and abuse of African men at the hands of Sheppard and other detention leadership, according to Fatma Marouf, the director of the Immigration Rights Clinic at Texas A&M University School of Law.

"We had evidence of this exact individual, kicking people calling them racial slurs, throwing them on the ground," Marouf told CNN by phone. "So it's not a surprise to me. It's just horrible that nothing was done earlier."

CNN has been unable to reach Sheppard or his attorney for comment.

Marouf's team and members of the Refugee and Immigrant Center for Education and Legal Services and the Immigration Clinic at the University of Texas at Austin interviewed 30 of the men and authored the 2018 report.

The report focused on the treatment of about 80 African men, ranging in age from their 20s to their 50s, many of whom had lived in the US for decades, had US citizen family members, and had been detained by US Immigration and Customs Enforcement on minor criminal offenses. Some of the men had arrived as child refugees fleeing persecution in their home countries.

The report alleges Sheppard and other leadership at the detention center used racial slurs, denied the men medical and mental health care, and also physically abused the individuals.

"He's quoted as saying things like, 'Shut your Black ass up. You don't deserve nothing. You belong at the back of the (that) cage,' calling people 'Boy,' things like that. Telling people 'You're my bitch,'" Marouf said.

CNN reached out to LaSalle Corrections for comment on the report after Sheppard was terminated last week but did not get a response.

Marouf says the authors of the report filed a complaint with the Department of Homeland Security Office of the Inspector General and with the US Department of Justice. The team received a letter from the department concluding there was no wrongdoing, according to a copy of the letter provided to CNN by Marouf. The Justice Department responded to them by saying the inspector general's office would take the lead, Marouf added.

"It often comes down to who you believe and that tends to be, you know, deference to law enforcement, unfortunately," Marouf said.

CNN has reached out to Department of Homeland Security Office of the Inspector General and has not immediately heard back. The US Attorney's Office for the Western District of Texas emailed CNN saying the office did not have a comment at this time.

Paid Links

Search CNN...

Log In

Live TV

Audio

US

World

Politics

Business

Markets

# EXHIBIT G

MINUTES:
HUDSPETH COUNTY WCID #1


REGULAR MEETING - SEPTEMBER 27, 2022
HELD AT THE WATER OFFICE.


ITEM 1.    CALLED MEETING TO ORDER AT 5:12 P.M. BY:
                                    PRES. MICHAEL ROSE

PRESENT:    MICHAEL ROSE, PAT BRANTLEY, TONY MORALES, NESTOR
            MENDOZA                            JUDY AND MAC

ABSENT:    JOE ELDER

GUESTS:    NONE

ITEM 2.    OPEN FORUM: NONE

ITEM 3.    MOTION BY TONY 2ND BY PAT TO APPROVE MINUTES AS READ
            FOR MEETING OF AUGUST 23, 2022        CARRIED

ITEM 4.    REVIEWED FINANCIAL STATUS AS OF SEPTEMBER 27, 2022.

ITEM 5.    REVIEWED 2023 F.Y BUDGET FOR THE 3RD MONTH.

ITEM 6.    MOTION BY PAT 2ND BY NESTOR TO PAY BILLS AS PRESENTED
            FOR SEPTMBER 2022. CARRIED

ITEM 7.    VAN HORN UPDATE: STILL TRYING TO GET IN TOUCH WITH
            RUDY MATA- ATTORNEY ABOUT RULE 11.

ITEM 8.    PART TIME POSITION IN VAN HORN. NO ACTION

ITEM 9.    PURCHASE TRUCK. MOTION BY NESTOR 2ND BY PAT FOR MAC
            TO PURCHASE TRUCK FOR ALLAMORE. CARRIED

PLAINTIFFS 001535

ITEM 10.   MANAGERS REPORT: DISCUSSED AT LENGTH WASH OUT AT
ALLAMORE. DISCUSSED SOME POSSIBLE ACTIONS.

OPEN DISCUSSION WITH SHERIFF ARVIN WEST ABOUT WELL
POSSIBILITIES. ALONG WITH LA SALLE WARDEN.

ITEM 11.   MOTION BY NESTOR  2ND BY PAT TO ADJOURN MEETING @ 7:37 P.M.
CARRIED.

_____
PRESIDENT

_____
SECRETARY

PLAINTIFFS 001536

# EXHIBIT H

# Placeholder for

## Sealed Documents in Court Custody

# EXHIBIT
# I

MINUTES:
HUDSPETH COUNTY WCID #1


REGULAR MEETING - OCTOBER 21, 2019
HELD AT THE WATER OFFICE.


ITEM 1.   CALLED MEETING TO ORDER AT 5:10 P.M. BY:
                         PRESIDENT MICHAEL ROSE

PRESENT:    MICHAEL ROSE, PAT BRANTLEY, NESTOR MENDOZA
                                              JUDY AND MAC

ABSENT:    JOE ELDER AND TONY MORALES

GUESTS:    DOAK PAINTER CPA

ITEM 2.    OPEN FORUM: NONE.

ITEM 3.    CPA DOAK PAINTER - PRESENTED FISCAL YEAR ENDING 6/30/2019
           AUDIT OF THE DISTRICT.
           WENT THRU AUDIT, REVIEWED AND DISCUSSED AUDIT

           MOTION BY NESTOR 2ND BY PAT TO ACCEPT AUDIT AS PRESENTED.
                                                   CARRIED

ITEM 4.    MOTION BY NESTOR 2ND BY PAT TO APPROVE AND SIGN CHECK TO
           PAINTER & ASSOCIATES FOR AUDIT.                CARRIED

ITEM 5.    MOTION BY PAT 2ND BY NESTOR TO APPROVE MINUTES AS
           READ FOR AUGUST 27, 2019 MEETING. CARRIED

ITEM 6.    REVIEWED FINANCIAL STATUS AS OF OCTOBER 21, 2019.

ITEM 7.    REVIEWED 2020 F.Y BUDGET FOR THE 4TH   MONTH.

ITEM 8.    MOTION BY PAT 2ND BY NESTOR TO PAY BILLS AS
           PRESENTED FOR OCTOBER 2019.        CARRIED

ITEM 9.    MOTION BY TONY 2ND BY NESTOR TO RATIFY BILLS PAID
           FOR SEPTEMBER 2019. NO QUORUM NO MEETING.   CARRIED


PLAINTIFFS 002172

ITEM 10.  NO UPDATE ON TOWN OF VAN HORN SITUATION. AT THIS MOMENT

ITEM 11  MANAGERS REPORT : WE GOT WORD THAT THE TOWN OF SIERRA
BLANCA HAD RAN OUT OF WATER.
WE WERE THEN JOINED BY COUNTY SHERIFF ARVIN WEST AND
LA SALLE WARDEN MIKE SHEPPARD. WATER SITUATION WAS
DISCUSSED AND PHONE CALLS WERE MADE TO VAN HORN AND
T.C.E.Q.

ITEM 12.  MOTION BY NESTOR  2ND BY PAT TO APPROVE IMPACT ADJUSTMENTS
AS PRESENTED. HAVE MET ALL CRITERIA FOR ADJUSTMENT.
CARRIED

ITEM 13.  MOTION BY NESTOR 2ND  BY PAT TO ADJOURN MEETING AT
7:10 P.M.   CARRIED.

_____  
PRESIDENT

_____  
SECRETARY

PLAINTIFFS 002173

MINUTES:
HUDSPETH COUNTY WCID #1


REGULAR  MEETING - OCTOBER 26, 2020
HELD AT THE WATER OFFICE.


ITEM 1.   CALLED MEETING TO ORDER AT 5:20 P.M. BY:
                          PRESIDENT MICHAEL ROSE

PRESENT:    MICHAEL ROSE,  TONY MORALES,  NESTOR MENDOZA
               JOE ELDER,                          JUDY AND MAC

ABSENT:    PAT BRANTLEY

GUESTS:    DOAK PAINTER CP - PAINTER AND ASSOC.

ITEM 2.     OPEN FORUM: NONE.


ITEM 4.      DOAK PAINTER PRESENTED FYE 6/30/2020 AUDIT OF DISTRICT.

             AUDIT WAS CLEAN.... EXPENDITURES FOR NON FORESEEN WITH
             WATER SHORTAGES AND EXPENSES ON AND FOR ALLAMORE
             WELLS TO HELP INCREASE WATER COMING TO SIERRA BLANCA,

             MOTION BY JOE 2ND BY NESTOR TO ACCEPT AUDIT AS PRESENTED.
                                              CARRIED
             MOTION BY NESTOR 2ND BY JOE TO SIGN CHECK TOR PAINTER
             AND ASSC FOR 2020 AUDIT.                CARRED

ITEM 3.     MOTION BY JOE SECONDED BY TONY TO APPROVE MINUTES AS
             READ FOR AUGUST, 2020 MEETING.           CARRIED

ITEM 5.     REVIEWED FINANCIAL STATUS AS OF OCTOBER 26, 2020.

ITEM 6.     REVIEWED 2021  F.Y BUDGET FOR THE 4TH  MONTH.
                                      Nestor
ITEM 7.     MOTION BY TONY  2ND  BY ~~PAT~~ TO PAY  BILLS AS
             PRESENTED FOR JULY 2020.        CARRIED

             MOTION BY JOE 2ND BY NESTOR TO RATIFY BILLS PAID FOR
             SEPTEMBER 2020. NO QUORUM MEETING.   CARRIED
ITEM 7.    UPDATE ON VAN HORN SITUATION, NONE


PLAINTIFFS 002205

ITEM 8.    MOTIONY BY JOE 2ND NESTOR TO ACCEPT MUTUAL AGREEMENT WITH FT. HANCOCK WATER, FOR WATER THAT IS ACCESSIBLE TO US WHEN NEEDED ON EMERGENCY BASES .    CARRIED

ITEM 9.    VAN HORN- CHANGE OF VENUE IS DONE FOR COURT CASE.

ITEM 10.    MANAGERS REPORT : WATER SAMPLE GOOD.
DISCUSSED  PLANS
FOR ALLAMORE WELLS. DISCUSSED  SURVEY AT
ALLAMORE PROJECT.  WELL.

FOCUS ORDER: GET APPRAISAL DONE - ENG.. GET PAPERWORK FOR BIDS.
HAVE SPECIAL MEETING IF NEEDED TO SIGN PAPER WORK OF PROPERTY TO DO TEST WELLS.

SEWER SYSTEM: PROBABLY GET FINED FOR BUSTING PERMIT.

CUT CHECK THAT LA SALLE HAS REFUSED TO PAY WD LOGISTICS FOR WATER HAULING ON 5/6/20 EMERGENCY FOR THE DETENTION CENTER.

ITEM 11.    MOTION BY NESTOR 2ND BY TONY TO APPROVE IMPACT ADJUSTMENTS ALL HAVE MET CRITERIA.                    CARRIED

ITEM 12.    MOTION BY TONY  2ND BY NESTOR TO ADJOURN MEETING @ 7:10 P.M.
                                            CARRIED

PRESIDENT    Secretary

SECRETARY

Member

PLAINTIFFS 002206

MINUTES: SPECIAL MEETING
HUDSPETH COUNTY WCID # 1

SPECIAL MEETING:
HELD: NOVEMBER 29, 2021 AT THE WATER OFFICE.

ITEM 1.    CALLED MEETING TO ORDER AT 3:12 P.M.
             BY: PRESIDENT MICHAEL ROSE

PRESENT:  MICHAEL ROSE, AND TONY MORALES, NESTOR MENDOZA.
                                              JUDY AND MAC

ABSENT:  PAT BRANTLEY AND JOE ELDER

GUEST :    SEE SIGN IN SHEET

ITEM 2:    SHERIFF ARVIN WEST EXPLAINED HOW THIS STARTED.

           CONTRACTOR CHARILE JOHNSON  EXPLAINED THAT THEY ARE
           ABOUT BUILDING HOUSES. WITH THAT SAID THEY STARTED THE
           CONVERSATION OF WATER SITUATION IN SIERRA BLANCA.

           TALKED ABOUT THE WELL AT THE SIERRA  BLANCA CORP IN
           WHICH THE COUNTY OWNS, AND WOULD GIVE THE PROPERTY
           TO THE CONTRACTOR TO DRILL THE WELLS AND WILL HAVE TO
           USE A RO SYSTEM TO CLEAN THE WATER. ALSO TO PREPARE THE
           PONDS AT THE CORP FOR THE WASTE WATER AFTER THE RO.

           EVERYONE DISCUSSED FULLY. AT THIS POINT WATER DISTRICT
           AGREED TO BUY THE WATER AND LA SALLE WILL BUY THE WATER
           FROM THE DISTRICT.

           CONTRACTOR WILL SEND A LETTER OF INTENT TO THE DISTRICT.

ITEM 3:    MOTION BY NESTOR 2ND BY TONY ADJOURN MEETING AT
             6:04 P.M.   CARRIED.


_____          _____
PRESIDENT                                SECRETARY


PLAINTIFFS 002251

# EXHIBIT
# J

## AFFIDAVIT OF PROBABLE CAUSE

I, Ranger Juan Torrez, state that I am the Complainant with regard to the alleged offense of __Manslaughter__ __Penal Code 19.04:a_____, which I state has been committed by __Michael Sheppard DOB__ ▉▉▉▉.

I further state that __Michael Sheppard__ , on or about the 27TH day of September, 2022; did the following:

I further stat that I have furnished this information to the Court of Jurisdiction  On September 27, 2022, a group of illegal immigrants were traversing the desert located near Sierra Blanca, Texas, which is located in Hudspeth County.  At approximately 7:00 pm MST the group stopped and was drinking water out of the reservoir at Fivemile Tank, which is located north of the intersection of Indian Hot Spring Rd and FM 1111.  A vehicle began to pass the group and the group took cover to avoid being detected.  The vehicle then backed up and the driver exited the vehicle.  The driver leaned on the hood of the vehicle and fired two shots from a firearm at the group of illegal immigrants.  The driver then re-entered the vehicle and fled the scene.  One of the illegal immigrants was struck in the stomach and was transported to the hospital.  Another illegal immigrant was fatally struck and died at the scene.  During interviews of illegal immigrants by Federal Agents, the illegal immigrants stated they overheard one of the males shout something in Spanish to the effect of, "Come out you sons of bitches, little asses!" then revved the engine of the truck.  The illegal immigrants then stated they were hiding in the brush, heard the engine of the vehicle rev so they looked up to see if the vehicle had driven away, at which point they heard two gunshots with one of them stating they had been shot.  Agents began checking cameras and located a vehicle matching the description of a vehicle from a previously stored image in a data base.  A vehicle matching the description was found in Sierra Blanca at ▉▉▉▉▉.  Agents made contact with the owner of the residence identified as Michael Sheppard.  Michael  Sheppard admitted the vehicle belonged to him. Michael Sheppard told us he was the only one that drives that vehicle.  We asked him about the incident involving the illegal immigrants and he was reluctant to speak with us about it and left.  Agents and I then conducted a non-custodial interview of Mark Sheppard.  Mark Sheppard initially told us that he was never in the location where the shooting occurred.  He later changed his story and admitted that  he and Michael Sheppard, his brother, were together on the evening of September 27, 2022.  Mark Sheppard told us Michael Sheppard was driving and they traveled to Fivemile Tank.  Mark Sheppard told us they stopped at Fivemile Tank and said they were looking for ducks, then changed it to birds and then to Javelina's.  Mark Sheppard told us he used binoculars and saw a "black butt" thinking it was a Javelina.  Mark Sheppard told us Michael Sheppard exited the truck with a shotgun, leaned on the hood of the vehicle and fired two rounds.  Mark Sheppard told us he asked Michael Sheppard something to the effect of, "did you get him?".  Mark Sheppard then changed "him" to "it".  I asked him if either he or his brother went to confirm that they had shot anything, and he said they did not.  Mark Sheppard told us they never yelled anything and after shooting then left to attend a Hudspeth Water Board meeting.  Mark Sheppard told us this was when he heard on the radio that an illegal immigrant was found at the dump suffering from a gunshot wound.  Mark Sheppard told us Michael Sheppard stated that's too far from where we were shooting.  We asked Mark Sheppard what he did when he found out that one of the illegal immigrants had been discovered deceased at the location he and his brother were shooting, and he said he did not do anything.  He also stated to us that he failed to report to any law enforcement authorities he and his brother were in the location where the illegal immigrant was discovered deceased the previous date shooting for the prosecution and for the purpose of filing a complaint and information.

AFFIANT

SWORN AND SUBSCRIBED TO BEFORE ME, by the said Affiant on the ___29TH___ day ___September___ , 2022, in Hudspeth County, Texas.

PLAINTIFFS 001618

NOTARY PUBLIC, STATE OF TEXAS
CLERK OF COURT
My Commission Expires _____
Notary's Printed or Typed Name

PLAINTIFFS 001619