IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| **NAPOLEON SEPULVEDA MORENO,** § <br> **LUZ MARIA MARTINEZ CASTRO,** § <br> **SANDRA LIZETTE CARDENAS** § <br> **RAMIREZ,** *Individually and Next Friend* § <br> *of S.S.C., minor child, Individually and for* § <br> *and on behalf of All Those Who Are* § <br> *Entitled to Recover Under the Texas* § <br> *Wrongful Death and Survival Acts for the* § <br> *Death of Jesus Ivan Sepulveda Martinez*, § <br> **and BRENDA BERENICE CASIAS** § <br> **CARRILLO,** § <br>     **Plaintiffs,** § <br> **v.** § <br> § <br> **LASALLE CORRECTIONS V LLC,** § <br>     **Defendant.** § | **EP-24-CV-00059-DB** |

## ORDER DENYING DEFENDANT LASALLE CORRECTIONS V, LLC'S MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

On this day, the Court considered Defendant LaSalle Corrections V, LLC's ("Defendant LaSalle") "Motion for Summary Judgment" ("Motion"), ECF No[1]. 79, filed on April 4, 2025. Therein, Defendant moves this Court to grant its Motion because the case "presents a straightforward application of well-established Texas tort law" and Defendant cannot be held liable for the actions of its employee. *Id.* at 9.  In their "Response to Defendant's Motion for Summary Judgment" ("Response"), Plaintiffs Napoleon Sepúlveda Moreno, Luz Maria Martinez Castro, Sandra Lizette Cardenas Ramirez, and Brenda Berenice Casias Carrillo ("Plaintiffs") argue that the "evidence establishes genuine issues of material fact" and "for this reason,

---

[1] "ECF No." refers to the Electronic Case Filing ("ECF") number for documents docketed in this matter.  When a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the page numbers assigned by the ECF system.

Defendant's motion should be denied in its entirety." Resp. 1, ECF No. 80. And finally, in their "Reply in Support of Motion for Summary Judgment" ("Reply"), Defendant counters by stating that "[c]lose scrutiny of the underlying evidence . . . reveals there is no genuine issue of material fact that would preclude summary judgment." Reply 3, ECF No. 84. Having considered the pleadings with their accompanying exhibits, arguments made by Plaintiffs and Defendant, as well as the record as a whole, this Court agrees with Plaintiff and is of the opinion that there exists at least one genuine issue of material fact and therefore Defendant's "Motion for Summary Judgment," ECF No. 79, should be denied. The Court will now address the issues in turn.

## II.   FACTUAL BACKGROUND

The record in this case is extensive, and while there are material facts that are in dispute, as this order makes clear, there are many facts which are agreed to by both parties. The Court will now summarize the undisputed facts.

On the evening of September 27, 2022, a group of migrants including Plaintiff Brenda Berenice Casias Carrillo ("Plaintiff Casias"), and Decedent Jesus Ivan Sepúlveda Martinez ("Decedent Sepúlveda") were walking in the desert near Sierra Blanca, Texas. "Plaintiff's First Amended Complaint" ("Amended Complaint") 3, ECF No. 10. Plaintiff Casias and Decedent Sepúlveda "were with a small group of people who had stopped to drink water out of a reservoir." *Id.* On that same evening, twin brothers Michael ("Mike") Sheppard and Mark

Sheppard[2] drove a truck and also stopped near the reservoir, which is in an area known as "Five Mile Tank[3]." *Id.*; *see also* Mot. 2, ECF No. 79.

Mike and Mark Sheppard both lived and worked in Hudspeth County, Texas on September 27, 2022. Mike Sheppard was "employed as a warden at LaSalle Corrections V LLC." Am. Compl. 4, ECF No. 10. Defendant LaSalle "operates the West Texas Detention Facility (hereinafter referred to as "West Texas") – a privately run 1,053[-]bed . . . detention center in Sierra Blanca, Texas." *Id.* at 3. While Defendant LaSalle operates the detention facility, "Hudspeth County owns the West Texas Detention Facility." Mot. 3, ECF No. 79. Mike Sheppard began working at West Texas in June 2015, where he was chief of security. Mot. 3, ECF No. 79. In March 2016, Mike Sheppard was promoted to warden at West Texas. *Id.* In his role as warden, Mike Sheppard "was the highest-ranking management person stationed at the facility." Am. Compl. 4, ECF No. 10. Some of Mike Sheppard's duties included "developing a departmental budget, coordinating with the regional warden, reviewing shift assignments for security staff, and directing work and reports on inmates." Mot. 3, ECF No. 79. Mark Sheppard worked in some capacity[4] for the Hudspeth County Sheriff's Office. Am. Compl. 4, ECF No. 10.

---

[2] The Court notes that Mike and Mark Sheppard were arrested for charges of manslaughter and aggravated assault with a deadly weapon shortly after the incident on September 27, 2022, however the cases against the brothers have stalled, languishing at the El Paso County District Attorney's Office with no movement. Adelaide Olberding and Emma Popkin, *Two Years After Sierra Blanca Migrant Shootings, Criminal Case Languishes*, EL PASO MATTERS (Sep. 22, 2024), https://elpasomatters.org/2024/09/22/sierra-blanca-migrant-shooting-sheppard-brothers-bill-hicks/; [https://perma.cc/6NB6-V62C].

[3] Defendant throughout their filings refers to the area of the shooting as "Five Mile Tank" whereas Plaintiffs refer to it as "Fivemile Tank." It is the Court's understanding that the correct spelling is "Fivemile Tank" and therefore will refer to it as such throughout.

[4] Plaintiffs and Defendant disagree as to Mark Sheppard's employment preceding the shooting. Plaintiffs allege that he was "employed as a detention officer with Hudspeth County Sheriff's Department." Am. Compl. 4, ECF No. 10. Whereas Defendant states that Mark Sheppard was "a maintenance worker for Hudspeth County." Mot. 2, ECF No. 79.

After stopping near the reservoir the evening of September 27, 2022, Mike Sheppard exited the truck with a shotgun. Am. Compl. 4, ECF No. 10. After exiting the truck, Mike Sheppard leaned on the hood of the truck with the shotgun, aimed his gun, and fired two rounds. *Id.* These two rounds killed Decedent Sepúlveda and critically injured Plaintiff Casias. *Id.* Shortly thereafter, Mike and Mark Sheppard left the Fivemile Tank area and attended a water board meeting at the water district's office. Mot. 4, ECF No. 79; Am. Compl. 5, ECF No. 10. The minutes from that night's meeting indicate that Mike Sheppard was present in his professional capacity as the "LaSalle warden." Ex. G, Resp. 94, ECF No. 80-1. It is also undisputed that prior to going to the Fivemile Tank area, and then to the water board meeting, Mike and Mark Sheppard were at a meeting at the Hudspeth County Sheriff's Office with Hudsepth County Sheriff Arvin West ("Sheriff West") and Hudspeth County Commissioner Andrew Virdell ("Commissioner Virdell"). Am. Compl. 4, ECF No. 10. It is also an undisputed fact that Hudspeth County was facing a water supply crisis[5] since at least 2019.

### III.    PROCEDURAL HISTORY

Plaintiffs initiated this action in federal court by filing their "Complaint," ECF No. 1, on February 22, 2024, and later filed their "First Amended Complaint" on April 15, 2024, ECF No. 10. For purposes of this instant order as well as the case generally, this Court regards the Amended Complaint, ECF No. 10, as the operative pleading. In their Amended Complaint, Plaintiffs allege the following causes of action: 1) assault and battery/wrongful death under

---

[5] Julian Aguilar, *ICE transfers detainees out of West Texas facility after water shortage in Sierra Blanca*, THE TEXAS TRIBUNE (Oct. 31, 2019), https://www.texastribune.org/2019/10/31/ice-transfers-detainees-out-west-texas-facility-due-water-shortage/. There are many references to Hudspeth County's ongoing water supply crisis in the record, however, for ease, the Court cites to this article which shows the crisis was widely reported on at the time of its occurrence.

Texas's wrongful death statute, Section 71.004 of the Texas Civil Practice and Remedies Code, on behalf of the parents of Jesus Ivan Sepulveda Martinez, his partner, as well as his surviving child; 2) a survival claim on behalf of the surviving heir of Jesus Ivan Sepulveda Martinez, under Section 71.021 of the Texas Civil Practice and Remedies Code; and finally 3) an assault and battery claim on behalf of Plaintiff Casias for the injury she sustained as a result of the shooting. Am. Compl. 6—7, ECF No. 10. Defendant responded to Plaintiffs' original Complaint by filing its "Motion to Dismiss or for Alternative Relief" ("Motion to Dismiss") on March 18, 2024, ECF No. 4. This Court subsequently denied Defendant's Motion to Dismiss as moot, as a new Complaint had been filed. *See* Order, ECF No. 12.

Defendant then filed its "Second Motion to Dismiss or for Alternative Relief" ("Second Motion to Dismiss"), ECF No. 13, on May 2, 2024. Plaintiffs responded to this subsequent motion on May 9, 2024. *See* Pls.' Resp. to Def.'s Second Mot. to Dismiss or for Alt. Relief, ECF No. 17. On May 10, 2024, this Court denied Defendant's Second Motion to Dismiss. *See* Order, ECF No. 18. Having denied both of Defendant's Motions to Dismiss, Defendant filed its "Answer to Plaintiffs' First Amended Complaint," ECF No. 20, on May 24, 2024. The case proceeded through discovery with Defendant ultimately filing the instant Motion for Summary Judgment, ECF No. 79, on April 4, 2025. Plaintiffs filed their response on April 11, 2025. *See* Resp., ECF No. 80. Defendant replied on April 18, 2025. *See* Reply, ECF No. 84.

### IV.   LEGAL STANDARDS

A. **Motion for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment,

states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The summary judgment standard "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247—48 (1986) (emphasis removed from original). Because not all disputed facts are material, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248 (citations omitted).

It is not necessary for a court to resolve a disputed fact "conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a judge or jury to resolve the" dispute at trial. *Anderson*, 477 U.S. at 248—49. This evidence can take the form of "pleadings, depositions, answers to interrogatories . . . admissions on file" and affidavits. *Id.* at 247. However, a nonmoving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted).

"Substantive law will identify which facts are material." *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992) (citations omitted). Here, the incident which made the basis of this suit occurred in Texas, so Texas law will govern. Am. Compl. 3, ECF No. 10.

### B. Vice Principal Doctrine

"In Texas, '[w]hen actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself." *Century Surety Co. v. Seidel*, 893 F.3d 328, 337 (5th Cir. 2018) (citations omitted). Because corporations are not considered people, they can "act only through agents of some character." *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997) (citation omitted).

This idea of the vice-principal doctrine in Texas was first laid out in *Fort Worth Elevators Co. v. Russell*, 70 S.W.2d 397 (Tex. 1934), and expanded on greatly in subsequent cases.

> "[A] vice-principal includes four classes of human agents: (a) Corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom a master has confided the management of the whole or a department or deviation of his business."

*Seidel*, 893 F.3d at 337 (citations omitted); *see also Hammerly Oaks*, 958 S.W.2d at 391. The term "vice principal" also "includes one who represents the corporation in its corporate capacity." *Hammerly Oaks,* 958 S.W.2d at 391.

### C. Respondeat superior

Another type of agency liability is respondeat superior. "Under Texas law, respondeat superior analysis determines whether conduct that constitutes an intentional tort was within an employee's scope of employment." *Rodriguez v. Sarabyn*, 129 F.3d 760, 767 (5th Cir. 1997). This allows for an employer to be "vicariously liable for the negligence of an agent or employee

acting within the scope of his or her agency or employment, although the principal or employer has not personally committed a wrong." *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998). And while it is true that "[a]s a general rule, one person is under no duty to control the conduct of another," *Otis Eng'g. Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983) (citing Restatement (Second) of Torts § 315 (1965)), "certain relationships do impose, as a matter of law, certain duties upon parties." *Id.* One of these legal duties is "on the part of the master to control the conduct of his servants outside the scope of employment." *Id.*

The scope of this legal duty is narrow. Specifically, "an employer is liable for its employee's tort only when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired." *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002). And "for an employee's acts to be within the scope of employment, 'the conduct must be of the same general nature as that authorized or incidental to the conduct authorized.'" *Id.* (citations omitted). The law is clear that "if an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during the deviation." *Goodyear Tire and Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007) (citing to *Minyard Food Stores*, 80 S.W.3d at 577).

### D. Agency Liability: "detour" versus "frolic"

Inherent in the analysis for agency liability is the idea of a "frolic" and a "detour" which can occur whenever an employee deviates from their original route or plan. This Court looks to the Third Restatement of Agency for guidance on these concepts. The main distinction between

a "frolic" and a "detour" is that a frolic does not impose liability on the employer, and depending on the circumstances, a detour may impose liability on the employer.

"An employee's travel during the work day that is not within the scope of employment" is known as a "frolic." *See* Restatement (Third) of Agency § 7.07 cmt. e. De minimis departures from assigned routes are not considered "frolics." *Id.* A "frolic" may also consist of activity on an employer's premises and within working hours. "Frolics end when an employee reenters employment, that is, when the employee is once again performing assigned work and taking actions incidental to it." *Id.* Texas courts have a long history of "absolving a corporation of negligence when its employee embarks on a "frolic"[] of his own." *Grogan v. Elite Metal Fabricators, Inc.*, No. 02-18-00048-CV, 2018 WL 6424216 at *6 (Tex. App. Dec. 6, 2018).

"[T]he conventional meaning of the term "detour" is a deviation from travel on an assigned route that is still within the scope of employment." Restatement (Third) of Agency § 7.07 cmt. e. "The primary test for determining whether an employee is acting within the course and scope of employment is whether the employer has the right to direct and control the employee's performance at the time of the alleged negligent act." *Arbelaez v. Just Brakes Corp.*, 149 S.W.3d 717, 720 (Tex. App. 2004) (internal citations omitted). However, even if travel by an employee is not within that employee's scope of employment, "an employer may be subject to liability for harm to third persons caused by the employee en route if the employer has breached its duty of reasonable care with regard to risks to third parties posed by the employee that the employer knows or should know." Restatement (Third) of Agency § 7.07 cmt. e.

## V. ANALYSIS

In deciding whether to grant or deny summary judgment in this instant case, this Court will not decide the scope of Mike Sheppard's employment duties on the night of September 27, 2022, when he was employed as a warden at the private LaSalle-run West Texas Detention Facility in Sierra Blanca, Texas. The scope of Mike Sheppard's employment duties is precisely the issue at hand that this Court believes is for a jury to decide. This Court will conduct a brief analysis of the arguments set forth by the parties, which are supported by evidence in the record, but does not make a determination as to the scope of Mike Sheppard's employment or the liability as to Defendant LaSalle for Mike Sheppard's actions on the night of September 27, 2022.

**A. There is a genuine issue of material fact as to Mike Sheppard's duties over the water supply at West Texas as warden.**

In its Motion, Defendant LaSalle argues to this Court that "Mike Sheppard simply was not acting in the course and scope of his employment with [Defendant] LaSalle when he committed the alleged torts." Mot. 7, ECF No. 79. The "alleged torts" include the shooting and killing of Decedent Sepúlveda, and the shooting and injuring of Plaintiff Casias, on September 27, 2022, in Sierra Blanca, Texas. Plaintiffs, on the other hand, contest Defendant LaSalle's characterizations of Mike Sheppard's "limited" duties as warden of West Texas. They argue that "Michael Sheppard's authority was extensive; he was 'responsible for the employment, direction, and discharge of employees at that facility,' and he himself confirmed that 'the buck stopped with [him] at [the West Texas] facility.'" Resp. 3, ECF No. 80 (internal citations omitted). Plaintiffs allege the evidence demonstrates that Mike Sheppard's "responsibilities encompassed virtually every aspect of operations [at West Texas]" and that Mike Sheppard "was tasked with implementing 'all new and revised policies effecting (sic) finance, food services, health services,

10

maintenance, human resources, security programs, classification, case management, education, and recreation." *Id.* (internal citations omitted).

While it is clear to this Court that Mike Sheppard's job as warden gave him significant authority over West Texas, the core issue is whether Mike Sheppard's role in the official response to water crisis in Hudspeth County, Texas, as it related to West Texas, was part of his duties as warden. To support their stance, Defendant LaSalle states that "[t]he uncontroverted evidence shows that Mike Sheppard's duties as warden were confined to the Facility where he worked" and that Defendant "LaSalle did not instruct Mike Sheppard to attend water district meetings, and third parties, such as Sheriff West, understood Sheppard attended in an individual capacity, not as a representative of LaSalle." Mot. 7, ECF No. 79. Defendant LaSalle further argues that "Mr. [Robert J.] Eason, who was [Mike] Sheppard's boss and LaSalle's corporate representative, confirmed that attending water board meetings was not part of [Mike] Sheppard's duties and responsibilities as LaSalle's warden." Reply 3, ECF No. 84 (internal citations omitted and emphasis removed from original).

Plaintiffs, to support their arguments, also point to Mr. Eason's deposition testimony at which time he stated that West Texas was "the biggest water user in Sierra Blanca." Resp. 4, ECF No. 80. Evidence in the record shows that Mike "Sheppard's efforts to address the water crisis went far beyond the walls of the detention facility." *Id.* Mike Sheppard testified in his own deposition that he "worked hand in hand with the sheriff" and coordinated with him "every day" to ensure water reached West Texas. *Id.* At the beginning of the crisis when Hudspeth County officials were unsure of the source of the supply crisis, Mike Sheppard "even searched for leaks in the water pipeline" by riding either a UTV or ATV along the main waterline. *Id.*; *see*

*also* Ex. A, Resp. 22, ECF No. 80-1.  Plaintiffs argue this search of the water line to find potential leaks was not done in Mike Sheppard's capacity as a private resident of Hudspeth County, it was likely done in his capacity as the warden of West Texas.  Resp. 4, ECF No. 80; *see also* Ex. E, Resp. 70, ECF No. 80-1.  As Mike Sheppard testified in his deposition, Sheriff West "had deputies assigned all over town going down every street everywhere that there were water lines.  We had people scattered everywhere looking." Ex. A, Resp. 14, ECF No. 80-1.

    While it's true that the water supply crisis affected all of Hudspeth County, as the biggest water user in Sierra Blanca, West Texas may have had an outsized role in coming up with a solution to the crisis.  While Mike Sheppard's direct supervisor, Mr. Eason, may not have explicitly told Mike Sheppard to find a solution to the ongoing water problem, it may have been implied in his role as warden that he had a role in finding a solution.  When asked whether he told his superiors about his involvement in the water supply crisis, Mike Sheppard responded "Yeah, Mr. Eason knew it.  I talked to him about it.  I kept him up to date every time it went out." Ex. A, Resp. 14, ECF No. 80-1.  Mike Sheppard was "sure" that he even told Mr. Eason about his involvement with the water district board.  Ex. A, Resp. 15, ECF No. 80-1.

    The question as to Mike Sheppard's duties regarding the water supply crisis he was facing in his role as warden at West Texas is a material fact, which will "affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  And while this Court doesn't decide whether water duties were part of Mike Sheppard's job description, the Court is of the opinion that there is "sufficient evidence supporting" this factual dispute which would "require a judge or jury to resolve the" dispute at trial.  *Id.* at 248—49.  For these reasons, Mike Sheppard's role in the response to the water

supply crisis is a fact that is material and in dispute, and therefore summary judgment cannot be granted as to this claim.

**B. There is a genuine issue of material fact as to whether Mike Sheppard was "on the clock" at the time of the shooting.**

Along with the question of whether Mike Sheppard's official duties as warden of West Texas included dealing with the water supply crisis, there is also the question of whether Mike Sheppard was on the clock at the time of the shooting. The parties argue as to the route Mike Sheppard took, the distance he traveled, and the time it took to get from one place to another on the night of the shooting. The Court finds that these are relevant inquires that go directly to whether Mike Sheppard was "on the clock" at the time of the shooting, or whether he committed the shooting in his free time. To support their claims, both parties cite to the distance between Fivemile Tank where the shooting took place, the office at which the water district meeting took place, and the sheriff's office. Both parties also discuss the meeting minutes taken at the water district meeting that night, and Plaintiff specifically discusses minutes taken at prior meetings.

Defendant LaSalle argues that "the most direct route from [the] Hudspeth County Sheriff's office where" Mike Sheppard was present to "the Water District meeting was about a two-minute drive." Mot. 7, ECF No. 79. But, "[i]nstead of taking this direct route, Mike Sheppard traveled five miles out of town to the Five Mile Tank area." *Id.* at 8. It is clear from the record that Mike Sheppard did not travel directly from the Hudspeth County Sheriff's office to the water district meeting. The distance between the Hudspeth County Sheriff's office to the location of the shooting on September 27, 2022 is approximately 5.3 miles. Mot. 8, ECF No. 79. Plaintiffs argue that the amount of time to go from the Hudspeth County Sheriff's office to Fivemile Tank to the water district meeting is "minimal." Resp. 15, ECF No. 80. Plaintiffs

13

argue that the drive to FiveMile Tank from the Hudspeth County Sheriff's office was approximately three to six minutes, and that the drive to the water district meeting would normally take only two and a half minutes from the sheriff's office. *Id*. Therefore, Plaintiffs argue, the minimal time difference of about "a half minute to three and a half minute[s]" "was not a significant deviation from [Mike Sheppard's] work-related travel to the Water District meeting." *Id.*

Next, after leaving work at West Texas, Mike Sheppard met with Sheriff West and Commissioner Virdell at the Hudspeth County Sheriff's office. Ex. F, Resp. 82, 84, ECF No. 80-1; *see also* Resp. 88-92, ECF No. 80-1; *see also* Ashely Killough, Rosa Flores, and Ed Lavandera*, A former prison warden and his brother face additional charges in the shooting of migrants in West Texas*[6], CNN (Oct. 7, 2022), https://www.cnn.com/2022/10/07/us/texas-brothers-sheppard-migrants-shooting. This Court does not have definitive evidence as to what was discussed at the Hudspeth County Sheriff's office immediately preceding the shooting on September 27, 2022. However, given all of the evidence in the record, it could be reasonably inferred that what was discussed at the meeting was likely both professional, meaning pertaining to Mike Sheppard's role as warden of West Texas, and personal in nature.

Finally, while Mike Sheppard drove for a few minutes out of his way to go to FiveMile Tank where he shot at Decedent Sepúlveda and Plaintiff Casias, his stop immediately after visiting FiveMile Tank was at the water district office for the scheduled meeting they had that

---

[6] The Court notes that while Commissioner Virdell could not remember, at the time of his deposition in January 2025, whether he was with Mike Sheppard and his brother Mark Sheppard immediately before the shooting on September 27, 2022, Commissioner Virdell did speak with CNN and stated that he "was having coffee with the brothers and the sheriff just a few hours before the shooting. They were at the sheriff's office together, but the brothers did not mention any plans to go hunting that evening."

night. In the meeting minutes from the meeting on September 27, 2022, Mike Sheppard is mentioned in the minutes, and is not identified by name, but by title as "La Salle (sic) warden." Ex. G, Resp. 94—95, ECF No. 80-1. Therein, the secretary of the water district wrote that there was an "open discussion with Sheriff Arvin West about well possibilities. Along with La Salle warden." *Id.* Based on evidence in the record, this is not the first water district meeting Mike Sheppard attended. Mike Sheppard on at least three separate occasions prior to the meeting on September 27, 2022 was either in attendance at the meeting and/or had business before the meeting in his professional capacity. *See* Ex. I, Resp. 98—102, ECF No. 80-1 (water district meeting minutes from October 21, 2019, October 26, 2020, and November 29, 2021 all of which Mike Sheppard was named as LaSalle warden in his professional capacity and/or LaSalle business was before the water board).

In trying to distance itself from Mike Sheppard's actions, Defendant LaSalle relies heavily on *Goodyear Tire*[7], but this Court believes its reliance is misplaced. In *Goodyear Tire*, Corte Adams, unable to make his tire delivery on time, went home to his father's house and "ate dinner, drank a few beers, and slept for approximately five hours." 236 S.W.3d at 756. After waking up, Adams left his father's house "to purchase cigarettes for his father. On his way to the convenience store, Adams fell asleep at the wheel, crossed the center line into oncoming traffic, and struck head-on a truck driven by Patrick Mayes. Both Mayes and Adams were injured in the collision." *Id.* While Defendant LaSalle wants *Goodyear Tire* to fit neatly into the facts of the instant case, they simply do not.

---

[7] *Goodyear Tire and Rubber Co. v. Mayes*, 236 S.W.3d 754 (Tex. 2007).

In *Goodyear Tire* there was at least a five-hour lapse between when Adams got home from work and went to his dad's house and when he left to get his dad cigarettes. Here, we know that short periods of time, minutes in some cases, passed between when Mike Sheppard left work at West Texas, drove to the Hudspeth County Sheriff's office, drove to FiveMile Tank, and drove to the water district meeting. All of the events in question took place within a few minutes and a few miles of each other.

Next, in *Goodyear Tire*, Adams planned to go to the store to buy his father cigarettes when he left the house and got into the car accident with Mayes. Going to pick up cigarettes for his father after eating, drinking, and sleeping for at least five hours was decidedly not related in any way to Adams' work delivering tires. Here, Mike Sheppard went from his job at West Texas, then on to the meeting at the Hudspeth County Sheriff's office, which may have been work-related, and then ultimately to the water district meeting, which may have also been work related. This Court agrees with the ultimate holding in *Goodyear Tire*, that the "evidence [did] not raise a genuine issue of material fact as to whether Adams was, or Goodyear knew or should have known that Adams was, an incompetent or reckless driver at the time Goodyear entrusts him with the truck" and so summary judgment was correctly granted. *Goodyear Tire*, 236 S.W.3d at 758. Those same issues are simply not present in this case.

To summarize, the timing of the events of the night of September 27, 2022 raise genuine issues of material fact as to whether Mike Sheppard was on the clock at the time he shot and killed Decedent Sepúlveda and shot and injured Plaintiff Casias.

**C. There is a genuine dispute as which theory of liability, if any, can be imputed to Defendant LaSalle.**

Plaintiffs and Defendant have different theories of liability as to the shooting. Plaintiffs argue that Defendant LaSalle is directly liable for Mike Sheppard's actions as he was a vice principal of their company. Defendant LaSalle argues that under the theory of respondeat superior, Defendant LaSalle cannot be directly or vicariously liable for Mike Sheppard's actions.

The facts in the record can reasonably support a finding that Mike Sheppard was a vice principal for Defendant LaSalle the night of the shooting. From the meeting minutes, it may be reasonably inferred that Mike Sheppard was *not* appearing in his personal capacity at the water board meeting, but was instead appearing as a vice-principal, or agent, or employee of the principal or employer Defendant LaSalle. As the court in *Seidel* explained, a "vice-principal includes those who have authority to employ, direct, and discharge servants of the master, those engaged in the performance of nondelegable or absolute duties of the master, and those to whom a master has confided the management of the whole or a department or deviation of his business." *Seidel*, 893 F.3d at 337 (citations omitted) (cleaned up). Mike Sheppard can potentially fit any one of those definitions of "vice principal." He had the authority to hire and fire employees at West Texas on behalf of Defendant LaSalle, he engaged in the performance of nondelegable or absolute duties on behalf of Defendant LaSalle, and finally, Defendant LaSalle had confided the management of West Texas, a part of their business, to Mike Sheppard as warden.

Defendant LaSalle argues that Mike Sheppard was not a vice principal, and instead the theory of respondeat superior and vicarious liability should apply to this case. Defendant LaSalle claims that because Mike Sheppard was not acting in the course and scope of his

employment with Defendant LaSalle at the time of the shooting at FiveMile Tank, Defendant LaSalle cannot be held vicariously liable for Mike Sheppard's tort actions.  Mot. 7, ECF No. 79.

The applicable theory of liability is determinative in this case. Each relies on whether Mike Sheppard had official responsibility over the water supply crisis at West Texas, whether Mike Sheppard was on the clock at the time of the shooting, and whether he appeared in his professional capacity at the water district meeting that night.  For all of these reasons, it is necessarily a genuine issue of material fact as to the liability of Defendant LaSalle, whether it be directly liable, vicariously liable, or not liable at all.  Therefore, this is a fact that the jury must resolve at trial.

## VI. <u>CONCLUSION</u>

Defendant LaSalle moves this Court to dispose of this lawsuit by granting their "Motion for Summary Judgment," ECF No. 79, because it believes there are no genuine issues of material fact for either the judge or the jury to decide.  This Court disagrees with Defendant LaSalle and finds that there are at least three different issues of material fact that go to the ultimate issue of liability for Defendant.  The Court has set this case for trial in the coming weeks, and accordingly, it will be up to the jury to determine Mike Sheppard's duties as to the water supply crisis, to determine whether he was on the clock at the time of the shooting, and ultimately to determine whether Defendant LaSalle should be held liable for the torts of their employee.

Accordingly, **IT IS HEREBY ORDERED** that Defendant LaSalle Corrections V, LLC "Motion to Dismiss," ECF No. 79, is **DENIED**.

**SIGNED** this  24th  day of **JULY 2025**.

                                       **THE HONORABLE DAVID BRIONES**
                                       **SENIOR UNITED STATES DISTRICT JUDGE**